**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Kenneth E. TEAGUE, Defendant–
Appellant.**

**No. 90–1706.**

United States Court of Appeals,
Seventh Circuit.

Argued May 30, 1991.

Decided March 12, 1992.

Rehearing and Rehearing En Banc Denied
April 23, 1992.

Barry R. Elden, Asst. U.S. Atty., Diane L. Saltoun, Asst. U.S. Atty. (argued), Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Algis F. Baliunas, Orland Park, Ill., Janis D. Roberts, Thomas A. Durkin (argued), Durkin, Foster, Roberts & Barnett, Chicago, Ill., for defendant-appellant.

Before COFFEY, EASTERBROOK and MANION, Circuit Judges.

COFFEY, Circuit Judge.

Kenneth E. Teague appeals his conviction, after a jury trial, of conspiring to possess with the intent to distribute 250 pounds of marijuana in violation of 21 U.S.C. § 846, the possession with the intent to distribute 250 pounds of marijuana in violation of 21 U.S.C. § 841(a)(1) and the use of a communication facility to commit a felony in violation of 21 U.S.C. § 843(b). We AFFIRM.

## I. FACTS

On November 9, 1988, a confidential informant for the Drug Enforcement Administration ("DEA") telephoned Teague to arrange a meeting between Teague, the informant and an undercover DEA agent, William Zopp, Jr., at the Phillips 66 truck stop near Joliet, Illinois to arrange for the sale of marijuana to Teague.[1] During the course of the scheduled meeting, the three men engaged in a wide-ranging conversation about drug deals that demonstrated Teague's awareness of other large marijuana and cocaine deals in which his acquaintances were involved. Teague complained several times because Special Agent Zopp and the confidential informant failed to bring him a sample of the marijuana, but he stated that his friends would take 500 pounds if it were dry and "if it's good." He stated that the guy who was providing the money for the deal was not familiar enough with marijuana to know whether it was good, but that Teague's "partner" would advise him regarding it. During this meeting the DEA agent and the confidential informant arranged to contact Teague the following week to see if Teague was

---

1. The confidential informant did not testify at trial, and the record fails to reveal how the informant and Teague knew of each other. It is evident from the first phone call, however, that Teague and the informant had not previously met, for the confidential informant suggested that they meet at the truck stop "and uh, let's see what each other looks like, okay."

able to finalize arrangements for taking delivery of the 500 pounds of marijuana.

Over the next twenty-six days, Zopp and his putative drug-dealing partner, DEA Special Agent Kevin Lane, phoned Teague twelve times to continue negotiating and finalizing the terms of the delivery of the marijuana (each of the conversations were recorded and introduced in evidence at trial). Teague's initial plan fell through because the person Teague expected to finance the purchase invested half a million dollars in another drug deal. Thereafter Teague offered to purchase 100 pounds of marijuana rather than 500, as he could finance that amount himself. But when Zopp informed Teague that he and his partner wanted an additional $50.00 per pound if they were going to sell 100 pounds only, Teague objected because he was able to get marijuana "fronted" to him if he were willing to pay $600 a pound.[2] Negotiations continued in subsequent telephone calls, with Teague attempting to persuade Zopp to sell him 100 pounds and Zopp resisting selling less than the 500 pound increment originally negotiated. Zopp finally agreed to sell Teague 250 pounds, but when it appeared that Teague would be unable to produce the finances for that amount, Zopp broke off negotiations and gave Teague a pager number for Special Agent Lane in order that "if you feel you are going to have the money together, you can just page him." Nine days later on November 30, 1988, Special Agent Lane telephoned Teague in response to Teague having called his pager. At this time Teague offered to buy the 250 pounds of marijuana if Lane would sell it for $500 a pound, accept payment for 100 pounds on delivery and "front" the other 150 pounds to Teague for a day or two following delivery. On December 2, 1988, when Zopp phoned Teague to finalize plans for delivery of the 250 pounds of marijuana, Teague informed him

that another man was going to provide $25,000.00 for the purchase and that Teague would borrow the other $25,000.00 from the bank. They arranged for Teague to meet Zopp at the Phillips 66 truck stop on December 5, 1988, at 1:00 p.m. for Teague to display the cash to Zopp, whereupon Zopp would arrange to have the marijuana delivered in his partner's van, which Teague would in turn use to transport the marijuana to a safe hiding place.

On the morning of December 5, 1988, DEA agents initiated surveillance of Teague's home at approximately 11:00 a.m. Shortly thereafter, at 11:20 a.m., officers observed one Dennis Cullick arrive at the Teague residence in a four-door blue Buick and enter the house. At approximately 12:20 p.m. Cullick left the Teague home in his blue Buick, followed by a man named Curt Lidle driving Teague's black convertible Corvette.[3] Lidle parked the Corvette in front of a bar and joined Cullick in the blue Buick. Agents observed the blue Buick arrive at the truck stop about 12:45 p.m. where Cullick purchased gas while Lidle entered the building at the truck stop. Approximately five minutes later Lidle exited from the buildings, entered the blue Buick and drove off. One agent followed the blue Buick to a fast-food place where Cullick and Lidle purchased sandwiches, after which they drove to a McDonald's parking lot to lunch. At approximately 1:00 p.m. the blue Buick was observed heading back toward the truck stop.[4]

At 1:00 p.m. Zopp met Teague in the parking lot of the truck stop. Teague was wearing a long, winter coat with bulging pockets. When Zopp asked him if he had the money, Teague took his hands out of his pockets and held the pockets open so Zopp could see into them. When Zopp observed that Teague's pockets were bulging with money, he gave a pre-arranged arrest

---

**2.** At trial, Special Agent Zopp testified that to "front" narcotics is "like the marijuana would have been on consignment."

**3.** Lidle apparently arrived at the Teague residence prior to the initiation of the surveillance. An unidentified woman apparently arrived prior to the surveillance as well, for she left the

Teague house along with an unidentified male, whom surveillance officers observed arrive and leave the Teague residence in a black Camaro.

**4.** At trial, Special Agent McCormick testified that the conduct of Cullick and Lidle constituted counter-surveillance.

signal to the surveillance agents, and Teague was quietly arrested. At the time of his arrest, Teague had $50,000.00 on his person.[5]

Teague was charged, and the district court set a trial date for May 30, 1989. But on May 26, 1989, defense counsel appeared before the trial judge and requested a continuance of the trial and that a status hearing be held 21 days thereafter because Teague had signed himself into a drug treatment program at Palos Heights Hospital in Illinois and was not scheduled for discharge until June 13, 1989. The court granted the continuance, and at an August 23, 1989 status hearing the following exchange regarding Teague's mental competency occurred:

"[DEFENSE ATTORNEY]: ... I have a client who has suffered some mental incapacity during the pendency of this case, and I have brought this to the Court's attention.

\* \* \* \* \* \*

"THE COURT: Is your client in a mental institution at this time?

"[DEFENSE COUNSEL]: No, he's not now. He has been, but he's not institutionalized currently.

"THE COURT: But you have raised the issue of his fitness, or competency, or mental state?

"[DEFENSE COUNSEL]: No, I have not. I have advised the Court of it, and the Government is aware of it, but I don't believe it rises to the level of competency proceedings."

This is the final mention of Teague's mental condition in the trial record, but, as will be discussed more thoroughly below, the record is void of evidence tending to establish that Teague was unable to understand the proceedings against him or to confer with his attorney on his own behalf.[6]

Teague was tried before a jury on October 25–31, 1989. The jury returned a verdict of guilty on all charges, including one count of a conspiracy to possess with the intent to distribute 250 pounds of marijuana in violation of 21 U.S.C. § 846; ten counts of the use of a telephone to commit a felony in violation of 21 U.S.C. § 843(b); and one count of possession with the intent to distribute 250 pounds of marijuana in violation of 21 U.S.C. § 841(a)(1).[7] Although Teague was convicted of conspiring to possess with the intent to distribute and possession with the intent to distribute 250 pounds of marijuana, the trial judge accepted his argument at sentencing that he should be held responsible for 100 pounds only, since Teague stated during the negotiations that "I'd rather just take 100."[8] Under the sentencing guidelines, the base offense level for 100 pounds of marijuana is 20, which the district court reduced by two levels because of Teague's acceptance of responsibility, for a base offense level of 18. With a Criminal History Category I (no prior convictions), the guideline range

5. The government charged Teague along with Cullick and Lidle with conspiracy to possess with the intention to distribute 250 pounds of marijuana in violation of 21 U.S.C. § 846 in a criminal complaint on December 5, 1988. For reasons undisclosed in this record, the government subsequently dismissed the charges against Cullick and Lidle.

6. It is interesting to note that the attorney who defended Teague as well as the trial judge found no evidence of mental incompetency at the time of trial and now the appellate counsel, interpreting a cold record, vehemently argues that Teague's mental state required a competency hearing.

7. On July 13, 1989, the government filed a superseding indictment, which added a forfeiture allegation pursuant to 21 U.S.C. § 853(a). The superseding indictment sought forfeiture of:

"a. All property constituting or derived from any proceeds the defendant obtained, directly or indirectly, as a result of his violations of Title 21, United States Code, Sections 841(a)(1) and 846; and

"b. All of the defendant's interest in property used and intended to be used in any manner or part to commit, or to facilitate the commission of, his violations of Title 21, United States Code, Sections 841(a)(1) and 846."

The jury rejected the forfeiture request, and on August 14, 1990, the government filed a civil forfeiture action against Teague's home. The trial judge in the civil action has stayed the proceedings, pursuant to the agreement of the parties, pending the disposition of this appeal.

8. We note that we are unconvinced that the record required a finding that Teague was responsible for 100 pounds only, but the government has not appealed this finding.

was 27–33 months. The district court sentenced Teague to 33 months imprisonment on each of the 12 counts, to be served concurrently with each other, and to be followed by four years of supervised release.

## II. ISSUES

The defendant on appeal raises the following issues for review: 1) whether the district court erred in failing to *sua sponte* order a competency hearing for the defendant; 2) whether the evidence was sufficient to convict Teague of conspiracy to possess with the intent to distribute 250 pounds of marijuana; and 3) whether the district judge erred in refusing to give Teague's requested entrapment instruction to the jury.

## III. COMPETENCE TO STAND TRIAL

 The appellant argues that the district judge should have ordered a competency hearing *sua sponte* prior to sentencing because a) the court was notified of Teague's hospitalization for psychiatric treatment at the May 26, 1989 hearing, and b) the pre-sentence report quoted the discharge summary from Palos Heights Hospital, which diagnosed Teague as suffering from major depression, generalized anxiety disorder and borderline personality disorder. 18 U.S.C. § 4241(a) states:

"At any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant, the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant. The court shall grant the motion, or shall order such a hearing on its own motion, if there is reasonable

cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."

Teague on appeal asserts that his hospitalization and the discharge summary therefrom constituted "reasonable cause" for the judge to believe that he may have been mentally incompetent to stand trial, and thus the court should have investigated the issue.[9] We note that the defense attorney's characterization of Teague's hospitalization as being for psychiatric treatment is inaccurate, for Teague checked himself into Palos Heights Hospital for a voluntary drug treatment program. The record fails to reveal that Teague received treatment for anything other than drug dependency.

 Due process requires that when sufficient evidence demonstrating reasonable cause to believe that a defendant is mentally incompetent to proceed before the court, it must order a competency hearing. "There must be, however, evidence of incompetence presented to the judge or some conduct of the defendant implying incompetence in order to 'establish reasonable cause.'" *Chichakly v. United States*, 926 F.2d 624, 633 (7th Cir.1991) (citation omitted). Absent specific evidence to the contrary, "there is a presumption that a criminal defendant is mentally competent to stand trial." *Id.*[10] In a factual situation like this, where the issue of the defendant's mental competency to stand trial was not raised in the trial court, *in order to justify a retrospective competency hearing, the appellant "must present facts 'sufficient to positively, unequivocally and clearly*

---

**9.** At oral argument on appeal, the appellant's attorney repeatedly insisted that the trial court erred in failing to order a competency hearing *sua sponte* because § 4241 is mandatory. But as we noted then, and reiterate now, the Section is mandatory only when "there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."

**10.** We note that once the issue of the defendant's mental competency is raised, the government bears the burden of proving that the defendant is competent to stand trial. *See United States, ex rel. S.E.C. v. Billingsley*, 766 F.2d 1015, 1023–24 (7th Cir.1985); *United States v. DiGilio*, 538 F.2d 972, 988 (3rd Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977).

*generate a real, substantial and legitimate doubt as to [his] mental competence.'"* *United States v. Collins,* 949 F.2d 921, 927 (7th Cir.1991) (citations omitted) (emphasis added). The only information the appellant points out that might conceivably raise the issue of Teague's mental competency at the time of his trial was the fact that the defendant's counsel advised the court that Teague voluntarily entered a hospital for a drug treatment program; and the pre-sentence report revealed that Teague was diagnosed as suffering from major depression, generalized anxiety disorder and borderline personality disorder four months prior to the trial. The appellant ignores the fact that the trial attorney, who dealt with Teague prior to and during the trial, also informed the court that *he did not believe Teague's mental state "rises to the level of competency proceedings."* Furthermore, Teague has cited no authority and thus failed to support his view that his alleged mental problems were of such a nature as to require the holding of a competency hearing, for major depression, generalized anxiety disorder and borderline personality disorder are not psychiatric problems that would prevent a defendant from understanding the proceedings against him and interfere with his ability to confer with his attorney on his own behalf. Additionally, the appellant has failed to point to any bizarre or questionable conduct of the defendant at trial or during the sentencing hearing that would evince mental incompetency to the court or lead the judge to question Teague's competency. Indeed, *from our review of the record, the defendant's exchanges with the trial judge, while limited in scope, reveal that he was able to respond clearly and properly to the court's questions, thus demonstrating an awareness of the proceedings.* Moreover, defense counsel made no allegation prior to or during trial that Teague was unable to consult with him regarding the charges against him or assist in his own defense.

> "The test for competency is whether the defendant 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.' *United States v. Garrett,* 903 F.2d [1105,] 1116 [(7th Cir.1990)] (quoting *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960))...."

*Chichakly,* 926 F.2d at 633. There is nothing in Teague's general discharge report from Palos Heights Hospital that meets the test to raise the issue of mental incompetency, for neither major depression, generalized anxiety disorder nor borderline personality disorder necessarily would lead us to believe that Teague was unable to consult with his lawyer or be incapable of understanding the proceedings against him. Given defense trial counsel's clear and unequivocal statement at the August 23, 1989 status hearing concerning Teague's mental state ("I don't believe it rises to the level of competency proceedings") and the trial judge's own observations, the trial judge was convinced that Teague was able to consult with his attorney and understand the nature of the proceedings.

> "[A] trial judge is certainly entitled to rely upon representations from an attorney that his client is competent: 'Counsel for a defendant, perhaps more than any other party or the court, is in a position to evaluate a defendant's ability to understand the proceedings and assist counsel with his defense.'"

*Id.* at 634–35 (citation omitted). If the trial attorney perceived evidence of incompetency in Teague's behavior, it would have been incumbent upon him to bring it to the court's attention. Teague's attorney not only did not raise the issue of incompetency to the trial judge but affirmatively stated that he did not believe Teague's mental state "rises to the level of competency proceedings." Our review of the record reveals no support for Teague's late claim that a competency hearing was required.

The appellant has failed to raise facts "sufficient to positively, unequivocally and clearly generate a real, substantial and legitimate doubt as to [Teague's] mental competence." *Collins,* 949 F.2d at 927. Thus, we need not remand this case for a

retrospective competency hearing. Furthermore, "[w]e refuse to criticize the trial judge for failing to hold a competency hearing, for 'one cannot fault a trial court judge for failing to determine a question that he has no reason to believe is an issue.'" *Chichakly*, 926 F.2d at 633 (quoting *United States ex rel. Rivers v. Franzen*, 692 F.2d 491, 497 (7th Cir.1982) (citation omitted)). We hold that Teague's voluntary participation in a drug treatment program and the psychiatric analysis contained in the discharge summary upon his release some four months prior to trial failed to constitute "reasonable cause to believe that the defendant may [have been] suffering from a mental disease or defect rendering him mentally incompetent" to stand trial.

## IV. SUFFICIENCY OF THE EVIDENCE

 Teague argues that the evidence was insufficient to support his conviction for conspiracy to possess with the intent to distribute the 250 pounds of marijuana because the only evidence upon which the jury could possibly have relied is "one, Teague's statements on the tapes referring to 'my people' and/or 'my man;' and, two, the 'counter-surveillance' performed by Cullick and Lidle." [11] We note that Teague faces a nearly insurmountable hurdle when attacking the sufficiency of evidence on appeal, even if we were to give the claim full consideration, for the standard of review is extremely deferential. "[O]nly when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict." *United States v. James*,

923 F.2d 1261, 1267 (7th Cir.1991) (quoting *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983), *cert. denied*, 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984)) (citations omitted). But we need not detail the plentiful evidence of the conspiracy, for while the defendant timely moved for acquittal at the close of the government's case, he failed to renew his motion for acquittal at the close of trial or within seven days after the verdict pursuant to Federal Rule of Criminal Procedure 29(c). "This court has ruled that such a failure to renew a motion for judgment of acquittal at the close of trial or within seven days after the verdict constitutes a waiver on appeal of any challenge to the sufficiency of the evidence which can be reviewed 'only where the defendant demonstrates a manifest miscarriage of justice' ...." *Id.* (quoting *United States v. Berardi*, 675 F.2d 894, 902 n. 16 (7th Cir.1982)). The government raised this waiver issue in its appellate brief, but Teague rather than arguing in his reply brief that his conviction of conspiracy "demonstrates a manifest miscarriage of justice," chose to "rely upon the arguments set forth in his initial brief." Thus, the defendant-appellant has waived any argument that the conviction for conspiracy to possess with the intent to distribute 250 pounds of marijuana constitutes a manifest miscarriage of justice and, consequently, he has waived the issue of the insufficiency of evidence.

## V. ENTRAPMENT INSTRUCTION

 Teague contends that the district court erred in refusing to give his entrapment instruction to the jury because there was sufficient evidence for the jury to find

---

**11.** The appellant asserts that the district court erred in allowing Special Agent McCormick to testify that in his opinion Cullick and Lidle were involved in counter-surveillance because McCormick was testifying as a lay witness pursuant to Federal Rule of Evidence 701, which requires that the testimony be "rationally based on the perception of the witness," and McCormick did not personally observe all of the activities of Cullick and Lidle which he concluded constituted counter-surveillance. The defendant failed to specify the grounds for his objection to this testimony at trial, so the issue is waived on

appeal unless the admission of McCormick's testimony was plain error. *See United States v. Wynn*, 845 F.2d 1439, 1442 (7th Cir.1988). Since we hold below that Teague has waived his argument as to the sufficiency of the evidence of a conspiracy to possess with the intent to distribute 250 pounds of marijuana, it is unnecessary for us to determine whether it was plain error for the trial court to admit McCormick's testimony, for the harm Teague asserts is that the testimony tended to establish the ultimate fact that there was a conspiracy and the identity of the conspirators.

that the government entrapped him into committing his offenses. The appellant "is quite right that if the evidence was such that a rational jury could have inferred that he was entrapped into committing the crime of which he was convicted, he was entitled to present the defense of entrapment to the jury." *United States v. Evans*, 924 F.2d 714, 716 (7th Cir.1991).

"For a defendant to raise the entrapment defense, he or she must, 'produce evidence of both the Government's *inducement* and his own lack of *predisposition*. Once a defendant accomplishes this, the burden shifts to the Government to prove beyond a reasonable doubt that the defendant was predisposed or that there was no Government inducement.'" *United States v. Carrasco*, 887 F.2d 794, 814 (7th Cir.1989) (citations omitted). After hearing the attorneys' arguments on Teague's requested entrapment instruction, the trial judge stated:

"I find that there is no evidence here to establish government inducement of the crime. And further that with respect to a lack of predisposition on the part of the defendant to engage in the criminal conduct the facts here are clearly that he was predisposed to commit the crime. He was ready and willing to engage in the activity.

"You can tell from what he said here that he was an experienced negotiator; that he had some knowledge of values; he had knowledge of the tricks of the trade, so to speak; he was an accomplished, knowing, experienced, willing participant in everything that occurred here."

While the cases speak in terms of governmental inducement as well as the defendant's lack of predisposition, the Supreme Court has described the criminal predisposition element as "the principal element in the defense of entrapment." *United States v. Russell*, 411 U.S. 423, 433, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973). The policy reason for the defense of en-

trapment reveals the essential nature of the defendant's predisposition to committing a crime:

"It is to prevent the police from turning a law-abiding person into a criminal.... A law-abiding person is one who resists the temptations, which abound in our society today, to commit crimes. Such a person can be induced to commit a crime only by grave threats, by fraud (the police might persuade him that the act they want him to commit is not criminal), or, in the usual case in which entrapment is pleaded, by extraordinary promises—the sorts of promises that would blind the ordinary person to his legal duties."

*Evans*, 924 F.2d at 717 (citation omitted). Rather than offering Teague an unusual opportunity to make greater-than-usual profits, the government merely proposed selling marijuana to him at market rates. It was the defendant who initially suggested the volume of 500 pounds of marijuana, and the DEA agent stated that the price to Teague would be $550.00 per pound while the price to his buyers was to be $625.00 per pound. When the appellant was unable to raise the finances for 500 pounds and offered to buy 100 pounds instead, Special Agent Zopp stated that the price for 100 pounds would be $600.00 per pound rather than $550.00. Teague was unwilling to pay $600.00 per pound because he had a source who would "front" marijuana to him at that rate. Teague eagerly pursued negotiations with Zopp until they finally agreed on the transaction of 250 pounds of marijuana at $500.00 per pound; Zopp agreed to sell 100 pounds for cash and to "front" the other 150 pounds to Teague.[12]

"A person who takes advantage of an ordinary opportunity to commit criminal acts—not an extraordinary opportunity, the sort of thing that might entice an otherwise law-abiding person—is not entrapped. Such a person is predisposed to crime in the sense that the ordinary profits of crime are incentive enough to him to commit crimes; he is ready and wait-

---

12. Teague has not argued that $500.00 per pound was below the going market price at the time of the transaction.

ing; all that is wanting is the opportunity."

*Id.*

We are unpersuaded by the appellant's argument that the government's persistence in calling Teague and attempting to set up the marijuana transaction carries this case beyond the "ordinary opportunity" referred to in *Evans.* The appellant contends that the government's "persistence even concerned the agent so much that he testified that he finally gave the defendant his partner's beeper number 'so to not put any undue pressure on Mr. Teague and not cause us any problems.'" Teague has misconstrued the import of Special Agent Zopp's testimony, for rather than being concerned about continuing to exert pressure on the defendant, Zopp's testimony evinces that he was attempting to avoid initiating undue pressure: "At this point in time it was quite evident to Special Agent Lane and myself that the negotiations weren't going real well, so to not put any undue pressure on Mr. Teague and not cause us any problems we just decided that I would just give Mr. Teague Mr. Lane's pager number." The problem in the negotiations to which Special Agent Zopp referred was Teague's temporary inability to raise the money for the purchase of the marijuana. Indeed, throughout the negotiations the primary subject was how Teague was going to come up with the purchase price. Nine days after Special Agent Zopp gave Teague the pager number, Teague contacted Special Agent Lane and informed him that he had sufficient funds to purchase 100 pounds of marijuana, providing Lane was willing to sell it for $500.00 per pound. He further stated that he would take an additional 150 pounds if Lane would accept payment for it the day after it was delivered. It is evident from the taped recordings of telephone conversations between the DEA agents and the defendant that Teague was eager to consummate the purchase of the marijuana from beginning to end. The record fails to reveal any evidence that the government agents provided Teague with anything other than an ordinary opportunity to profit from committing a crime. *Cf. Evans,* 924 F.2d at 717.

In addition to the fact that Teague was merely provided an ordinary opportunity to profit from criminal activity, his predisposition to commit crimes in drug trafficking is revealed through several items contained in the tape recorded conversations. During Teague's initial meeting at the truck stop with Special Agent Zopp and the confidential informant, he offered the informant an "eye-opener," which turned out to be .402 grams of cocaine of 82% purity. Special Agent Zopp testified that:

"The 82% pure indicates that this is a high-quality cocaine, the kind that you would generally see coming from a cocaine manufacturing source or very close to the top. A person who would possess cocaine like this would generally not use it or ingest it, but they would add what is known as a cut, which would be adulterants or dilutants to increase its substance, and by that, you would increase your money flow coming back to you if you sold that."

More significantly, Teague exposed his predisposition to engage in selling marijuana through his statement in a telephone conversation on November 21, 1988, where he said that he traded a van "worth about 5 grand" for seven and one half pounds of marijuana "the other day." During the same conversation, in speaking of a potential source of financing for the drug transaction, he stated that the guy "won't talk on the phone at all" but "my phone I check out everyday.... I got a girl that checks it for me." In view of the positive evidence of Teague's predisposition to engage in drug trafficking, and the lack of evidence in the record from which "a rational jury could have inferred that he was entrapped into committing the crime of which he was convicted," *Evans,* 924 F.2d at 716, we hold that the district court's action in refusing to give the defendant's entrapment instruction to the jury was proper.

## VI. CONCLUSION

As the appellant has failed to submit facts "sufficient to positively, unequivocal-

ly and clearly generate a real, substantial and legitimate doubt as to [his] mental competence" at the time of trial, *Collins*, 949 F.2d at 927, and in fact his attorney stated, "I don't believe [Teague's mental state] rises to the level of competency hearings," his belated claim of mental incompetence to stand trial does not justify a retrospective competency hearing. Furthermore, Teague has waived the issue of insufficiency of the evidence as to his conviction for conspiracy to possess with the intent to distribute 250 pounds of marijuana, and the trial court properly refused to give a jury instruction on entrapment because the record supports his finding that Teague was predisposed to commit the crimes charged. The judgment of the district court is

AFFIRMED.