983 F.2d 1073
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Juan HERRERA and Estanislad Herrera, Defendants-Appellants.
 Nos. 92-1936, 92-1944.
 United States Court of Appeals, Seventh Circuit.
 Argued Nov. 18, 1992.
Decided Jan. 15, 1993.
 
 Before BAUER, Chief Circuit Judge, and RIPPLE and ILANA DIAMOND ROVNER, Circuit Judges.
 
 ORDER
 
 1
 Juan Herrera ("Juan"), Estanislad Herrera ("Estanislad"), and Juan Mota ("Mota") were indicted on two counts charging them with conspiring to distribute cocaine in violation of 21 U.S.C. § 846, and with knowing and intentional possession of approximately 5,014 grams of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). A jury convicted Juan and Estanislad on both counts. Mota fled before trial and remains a fugitive. On appeal, the defendants have challenged the sufficiency of the evidence to support the jury's guilty verdict on both counts.
 
 I. BACKGROUND
 
 2
 The evidence presented at trial revealed that the conspiracy began on November 27, 1990, when Domingo Alvarez and Reuben Alcantar, two confidential informants ("CI's") assisted the Drug Enforcement Administration ("DEA"), in targeting Mota for investigation. CI Alvarez was paged by CI Alcantar, and Alvarez responded by phoning Alcantar at a bar that he owned. Also present in the bar were Mota and Estanislad, who had accompanied Mota to the bar. After briefly speaking with Alvarez, Alcantar handed the phone over to Mota. Alvarez testified at trial that his subsequent conversation with Mota regarding the "five guys ready to work" and his query as to "when ... they [were] ready to start" was a coded exchange revealing Mota's desire to sell and Alvarez's wish to buy five kilograms of cocaine. Alvarez, Alcantar, and Mota all agreed to meet at a McDonald's restaurant the following morning to discuss the details of the five-kilogram transaction.
 
 
 3
 Just prior to the 11:30 a.m. meeting concerning the transaction at the McDonald's on November 28, Alvarez attended a meeting at the DEA office. DEA agents determined that Alvarez and DEA Agent Martinez would pose as the parties financing the purchase of the five kilograms of cocaine. Officer Raphael Tovar was assigned to pose as the buyer. Before attending the meeting with Mota, Officer Tovar was equipped with a tape recorder and transmitter and Alvarez was equipped with a tape recorder.
 
 
 4
 Tovar accompanied Alcantar to the McDonald's restaurant. Alcantar introduced Tovar to Mota, who had been waiting in the restaurant with Juan and Estanislad. Tovar introduced himself to Estanislad, who thereupon introduced Juan. Mota and Tovar subsequently negotiated the details of the cocaine transaction in the presence of Juan and Estanislad. In coded terms, Mota told Tovar that he would show him a kilogram of cocaine. If Tovar was satisfied with the appearance of the demonstration kilogram, Mota told him that he should give Juan and Estanislad the keys to his car so that Juan and Estanislad could then put all five kilograms of cocaine in Tovar's trunk. At this point, Estanislad interjected that Tovar should have no apprehensions about this arrangement. When Tovar objected, Estanislad assured him that "We are all friends." Tovar finally agreed to conduct the transaction at a location that the defendants chose.
 
 
 5
 The five men then left the McDonalds to proceed to a store that the defendants rented. Estanislad again assured the agents that the deal would proceed without any complications, and he noted that caution was required "[w]ith things the way they are." Estanislad, Alcantar, and Tovar then traveled in Tovar's car, and Juan and Mota left in Mota's automobile. During the ride to the store, Estanislad twice more reassured Tovar that his apprehensions were unfounded.
 
 
 6
 When they arrived at the store, Estanislad told Tovar to park behind Mota's Cadillac. Estanislad directed Tovar and Alcantar inside a grocery store at that location, where Juan and Mota were waiting. Estanislad told Tovar and Alcantar to accompany him to a small room in an apartment located at the rear of the store. Mota and Juan joined them. Juan then handed a plastic baggy containing 13.66 grams of cocaine to Mota, who in turn began to hand the drug over to Alcantar. Alcantar told Mota that Tovar would test any samples, so Mota gave the baggy to Tovar. While inspecting the cocaine, Tovar conversed with Juan, Estanislad, and Mota about the quality and origin of the cocaine. After Tovar expressed his satisfaction with the drug, Mota reiterated his request for Tovar's car keys and he asked to see the money Tovar would use to purchase the cocaine.
 
 
 7
 Tovar refused to show the defendants the money, however, before they showed him all five kilograms of cocaine. Mota responded that they only had four kilograms at that location, but that they would retrieve the fifth kilogram. Mota then stated that they could inspect the money and the four kilograms while Estanislad left to pick up the fifth kilogram. Mota and Juan left the store with Tovar and Alcantar to inspect the purchase money, and Estanislad went to get the last kilogram.
 
 
 8
 After Tovar entered his car with the defendants, he called Agent Martinez and directed him to meet them at a Kentucky Fried Chicken ("KFC") restaurant. When Tovar and the defendants arrived at the KFC, Agent Martinez and Alvarez were waiting for them with the money. Mota informed Tovar that Juan would inspect the money with him. Tovar, Mota, and Juan walked over to Agent Martinez' automobile, and Alvarez displayed $100,000.00 inside an open bag. The parties then agreed that the deal would be completed back at the store, where Tovar would call Agent Martinez and Alvarez to bring the buy money after Tovar had inspected the five kilograms of cocaine.
 
 
 9
 When Tovar, Alcantar, Juan, and Mota arrived back at the store, Mota informed Tovar that the four kilograms of cocaine were in a Chevrolet Blazer that was parked in front of the store. Tovar went with Mota to the Blazer to obtain the cocaine, which was located on the floorboard behind the front passenger seat. Tovar and Mota brought the cocaine into the apartment behind the store where Juan and Alcantar were waiting. Juan provided Tovar with a knife to open the box in which the cocaine was enclosed, and Juan assisted Tovar in removing the individual kilogram bricks of the drug. After Tovar inspected the four kilograms of cocaine, Juan asked Mota whether he should return the cocaine to the Blazer. Mota decided against taking it outside, and Juan placed the box containing the cocaine under a chair.
 
 
 10
 While waiting for Estanislad to return with the fifth kilogram of cocaine, Tovar conversed with Juan and Mota on various topics. Juan lamented the aggressive actions of a local Chicago police officer who was interfering with the drug business in the area. When Tovar inquired as to Estanislad's progress in retrieving the last kilogram, Juan left to use a pay phone and reported that Estanislad was on his way back to the store. A short time later, Estanislad arrived and walked into the room with a paper bag from which he removed a kilogram brick of cocaine. Estanislad commented that "it wasn't easy" to obtain the last kilogram. Tovar tested this kilogram as he had the other four and found it to be satisfactory. Tovar, Mota, and Juan then repackaged the cocaine. Tovar and Mota carried the cocaine out of the store, where Tovar gave the arrest signal to agents waiting outside.
 
 
 11
 Estanislad was taken to the DEA office after his arrest, where agents gave him his Miranda rights in English and Spanish. Estanislad waived his rights and admitted that he had gone to 86th Street and Commercial Avenue to pick up the fifth kilogram of cocaine. He also stated that Mota told him that he would be paid for his role in the transaction.
 
 
 12
 Both Juan and Estanislad testified at trial. Juan testified that he worked as a butcher for Mota at his grocery store. Juan also stated that he merely accompanied Mota to the McDonalds restaurant when the initial meeting took place and was later present at the store when the drug transaction occurred, but he had no idea during this time that a drug transaction was taking place. Estanislad similarly testified that he was merely in Mota's presence when Tovar and Mota conducted their deal, and he denied any knowledge of or participation in the drug transaction. Estanislad also testified that he did not voluntarily waive his rights before he made incriminating remarks, and that his statements regarding his retrieval of the fifth kilogram merely expressed his after-the-fact knowledge of the package's contents.
 
 II. DISCUSSION
 
 13
 The defendants allege that the evidence presented at trial was insufficient to establish that they were parties to an agreement to possess cocaine with the intent to distribute it. Essentially, the defendants allege that they were merely in the presence of others who engaged in a drug transaction, and that they had no knowledge of what occurred. The defendants also argue that the evidence presented at trial was insufficient to prove that they knowingly and intentionally possessed cocaine with the intent to deliver it.
 
 
 14
 The defendants have a substantial burden when challenging the sufficiency of the evidence.[1] To prove a conspiracy to distribute in excess of five kilograms of cocaine under 21 U.S.C. § 846, the government must demonstrate that (1) two or more persons agreed to distribute more than five kilograms of cocaine, and (2) the defendants were parties to this agreement. See United States v. Collins, 966 F.2d 1214, 1219 (7th Cir.1992); United States v. Navarez, 954 F.2d 1375, 1380 (7th Cir.1992). We will affirm a conviction if the evidence, when viewed in a light most favorable to the government, establishes that a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Van Wyhe, 965 F.2d 528, 531 (7th Cir.1992). We do not reweigh the evidence or judge the credibility of witnesses, Van Wyhe, 965 F.2d at 531; United States v. Johnston, 876 F.2d 589, 593 (7th Cir.), cert. denied, 493 U.S. 953 (1989), and we draw all reasonable inferences in favor of the government. When a defendant challenges the sufficiency of the evidence connecting him to a conspiracy, we look for substantial evidence of his participation. United States v. Durrive, 902 F.2d 1221, 1228 (7th Cir.1990). A conspiracy conviction, however, may be based upon circumstantial evidence. United States v. Cea, 914 F.2d 881, 886 (7th Cir.1990).
 
 1. The Conspiracy Charge
 
 15
 The defendants contend that a conspiracy did not exist because, absent their involvement, only Mota and government agents had a meeting of minds to commit the offense. The defendants' entire summary of the evidence presented at trial, however, ignores the testimony of the government's witnesses, emphasizes the defendants' testimony that their presence during critical moments of the drug transaction was coincidental and innocent, and incorrectly implies that we should consider the evidence in the light most favorable to the defendants. See Durrive, 902 F.2d at 1229. The jury could have rationally determined that the defendants were active participants in a drug distribution conspiracy. The evidence adduced at trial established numerous instances of cooperative activity among Juan, Estanislad, and Mota that could allow a jury to conclude that Juan and Estanislad were acting in concert with Mota in furthering the five-kilogram transaction.
 
 
 16
 After the initial phone call between Mota and Alvarez, both Juan and Estanislad accompanied Mota to the McDonald's restaurant where the transaction was to ripen, and Estanislad repeatedly reassured Tovar that their suggested manner of exchange was safe. Estanislad further explained that caution was prudent because of "the way things are". In the presence of Juan and Estanislad, Mota told Tovar, "If you want we go and we show you one there and you give us the keys to your car." The defendants emphasize that there were no explicit references to cocaine during their conversations. Government agents, however, testified that the exchanges that they had with Juan and Estanislad were laden with code words for cocaine, and that this method of communication was intended to avoid using explicitly incriminating language in the event their conversation was overheard or monitored. This court has repeatedly held that the use of coded language by drug conspirators and the absence of references to narcotics is commonplace and juries are entitled to infer reasonable meanings. United States v. Olson, Nos. 91-3269 & 91-3270, slip op. at 12 n. 6 (7th Cir. Nov. 5, 1992); United States v. Briscoe, 896 F.2d 1476, 1496 (7th Cir.1990). The jury could have reasonably inferred that the conversations that Juan and Estanislad had with Tovar concerned the cocaine transaction.
 
 
 17
 The evidence presented at trial clearly established that the defendants were present throughout the entire drug transaction and committed numerous acts in furtherance of the conspiracy. The defendants contend that because they did not participate in the phone conversation between Mota and Alvarez they did not have a conspiratorial agreement to engage in this transaction. Evidence of the defendants' subsequent involvement was substantial, however. Furthermore, the defendants did not have to join the conspiracy at the beginning, know all of the conspirators, or know the precise means by which the conspiracy's purpose was to be accomplished to be deemed members of the conspiracy. United States v. Martinez de Ortiz, 907 F.2d 629, 636 n. 1 (7th Cir.1990), cert. denied, 111 S.Ct. 684 (1991). The evidence of the defendants' participation in the transaction after Alvarez' originating phone conversation with Mota, as set forth above, was substantial and more than sufficient to support the jury's verdict on the conspiracy count.
 
 2. The Possession Charge
 
 18
 A conviction under 21 U.S.C. § 841(a)(1) of possession with the intent to distribute cocaine requires proof that a defendant (1) knowingly or intentionally possessed cocaine, (2) possessed cocaine with the intent of distributing it, and (3) knew that the substance was a controlled substance. See United States v. Troop, 890 F.2d 1393, 1398 (7th Cir.1989). The defendants assert that there was insufficient evidence that they knowingly and intentionally possessed cocaine with the intent of distributing it. Because of this deficiency the defendants maintain that the conspiracy conviction must fall with the possession charge due to lack of specific intent to commit the conspiracy's underlying purpose.
 
 
 19
 The defendants claim that the absence of any evidence that they participated in the negotiations or used the word "cocaine" in their conversations barred the jury from finding that they possessed cocaine with the intent to distribute it. As we noted in our discussion of the conspiracy charge, juries are entitled to infer reasonable meanings from evidence containing coded references to narcotics. The jury's determination that Juan and Estanislad's conversations and actions demonstrated knowledgeable possession of cocaine and the intent to distribute it to Tovar was reasonable and supported by substantial evidence. Juan and Estanislad may not have been the conspiracy's braintrust, but they certainly played an integral part in its furtherance. As we also noted in our discussion of the sufficiency of the evidence supporting the conspiracy charge, the defendants' failure to participate in the initial phone negotiations in no way diminishes the importance of their subsequent extensive involvement in the conspiracy.
 
 
 20
 The defendants reliance on United States v. Samad, 754 F.2d 1091 (4th Cir.1984), is misplaced. In Samad, a case involving a controlled delivery of a mailed package containing heroin, the Fourth Circuit found insufficient evidence to support a possession with intent to distribute charge against a defendant who received a package containing drugs that was mailed from outside the United States. The government had presented no evidence in Samad that the defendant knew that the package he received contained heroin. In the present case, Tovar testified that Juan brought him a baggy of cocaine to be tested for purity and that Estanislad retrieved the fifth kilogram of cocaine to close the deal. In addition to this unambiguous evidence of actual possession, reasonable inferences can be drawn from other evidence in the record supporting the conclusion that Juan and Estanislad had possession and control over the cocaine. See United States v. Garrett, 903 F.2d 1105, 1112 (7th Cir.) (constructive possession is sufficient to support a conviction under 21 U.S.C. § 841(a)), cert. denied, 111 S.Ct. 272 (1990). Juan and Estanislad each handled the cocaine and helped Tovar and Mota to repackage it; Juan and Estanislad demonstrated their knowledge of where the four kilograms of cocaine was located; both defendants were present in the room at the rear of the store when Tovar opened and inspected the kilograms of cocaine; and Estanislad knew where to retrieve the last kilogram of cocaine.
 
 III. CONCLUSION
 
 21
 The judgments of the district court are AFFIRMED.
 
 
 
 [1]
 Estanislad Herrera's burden is greater still; by failing to renew his motion for acquittal at the close of the trial or within seven days of the verdict pursuant to Federal Rule of Criminal Procedure 29(c), he waived any challenge to the sufficiency of the evidence. United States v. Teague, 956 F.2d 1427, 1433 (7th Cir.1992). In the face of such an omission, we may reverse a conviction only where the defendant demonstrates a miscarriage of justice. Id. In the present case, the jury's verdict was not a miscarriage of justice. In all events, the evidence of Estanislad Herrera's guilt was sufficient to support the verdict even under the normal standard of review