In the

# United States Court of Appeals
### For the Seventh Circuit

_____

Nos. 12-3919 & 13-1515

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DONELL A. THOMAS and
LAMAR CHRISTOPHER CHAPMAN III,

*Defendants-Appellants.*

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 CR 642 — **Elaine E. Bucklo**, *Judge.*

_____

ARGUED JUNE 5, 2014 — DECIDED AUGUST 14, 2014

_____

Before WOOD, *Chief Judge*, and EASTERBROOK and KANNE,
*Circuit Judges.*

WOOD, *Chief Judge*. Donell Thomas and Lamar Chapman
III were convicted of multiple counts of wire fraud after a
jury trial. The jury found that they were part of a scheme to
fleece real estate lenders by concocting multiple false sales of
the same homes and using the loan proceeds from the later
transactions to pay off the earlier lenders. Thomas was also
convicted of aggravated identity theft for using a real estate

investor's identity without permission to craft a phony sale of a home that the victim never owned.

Thomas and Chapman both challenge the sufficiency of the evidence underlying their convictions, though neither disputes the government's general depiction of the scheme. Thomas claims only that the evidence was insufficient to convict him of aggravated identity theft because there was no proof that he created or used the falsified documents at issue. Chapman argues that there was no evidence that he—the defendant at the trial—was *the* Lamar Chapman identified by the evidence, because no courtroom witness testified to that effect. Chapman also raises due process challenges to his conviction: he asserts that his rights were violated when the government dropped a co-defendant from the indictment and that the government failed to turn over unspecified exculpatory evidence. We find that the evidence was sufficient to support the convictions of both defendants, and that Chapman's due process claims are without merit. We therefore affirm the district court in all respects.

## I

The government introduced a substantial amount of evidence detailing the scheme, including testimony from several victims, an FBI investigator, an auditor, and an indicted co-defendant who had already pleaded guilty. As the precise details of the defendants' misdeeds are largely immaterial to this appeal, we paint their activities with a broad brush and delve into minutiae only when necessary.

The government initially charged Thomas, Chapman, Juan Orozco, and Eddie J. Cox, Jr., with wire fraud in July 2010. An indictment and superseding indictment followed

and added Anthony Allen as a defendant; Orozco and Allen pleaded guilty to the charges against them in this latter indictment pursuant to plea agreements. A second superseding indictment charged Thomas with eight counts of wire fraud in violation of 18 U.S.C. § 1343, and Chapman with four counts of the same. It also charged Thomas with one count of aggravated identity theft in violation of 18 U.S.C. § 1028A. It was this indictment on which Thomas and Chapman went to trial. Cox, for his part, was dismissed from the case pursuant to a government motion shortly after the grand jury returned the second superseding indictment.

The trial evidence showed that Thomas and Allen were the ringleaders of the operation, which was run out of a business called Chicago Abstract and Title Company. The group targeted short-term real estate lenders, referred to as "transactional lenders" at trial. Those lenders provide funding for structured real estate transactions called "A to B, B to C" transactions: the property is first sold by the original owner (A) to a real estate investor or agent (B), and then resold (typically within 48 hours) to an end-purchaser (C). Critically, all aspects of the transaction are to be contemplated in advance. The transactional lenders provide the funds to finance the front-end (A to B) transaction, although it might be more accurate to say they provide the assurance of funds, as they generally require the second sale to be completed before they will release the funds for the first, in order to avoid taking on any risk. The defendants exploited this funding model by falsely representing to the lenders that they had completed back-end (B to C) sales of homes they acquired. This allowed them to secure release of the transactional lenders' funds and enabled them to take a cut for themselves. They then repaid the short-term loan money by

falsifying another B-to-C transaction involving the same property with a different transactional lender, and used the loan proceeds from that "sale" to pay back the previous lender, in much the same manner that one would run a Ponzi scheme.

Thomas and Allen recruited Orozco, a closing agent at Chicago Abstract, to process the transactions, release the short-term lenders' funds, and pay back the lenders with proceeds from a different lender. Chapman, who has never been licensed to practice law, became involved as the operation's putative attorney, corresponding with transactional lenders to discuss funding for the deals and putting them off the scent of the rotten transactions lying behind the deals.

Though Thomas proved adept at using fake names to avoid detection, the conspirators generally used real homes in connection with their fraudulent transactions; that is, the "A-to-B" portion of the structured sale was real, and only the "B-to-C" sale was a fake. In at least one case, however, Thomas concocted a "sale" that was a fiction from the start; this was the basis for his aggravated identity theft charge. Among the documents found at Chicago Abstract's office when it was finally audited at the request of a jilted lender was an agreement to sell a home on South Langley Avenue in Chicago, signed by purported homeowner Oscar Corona with Thomas listed as the buyer. This document was accompanied by a HUD-1 statement for the "sale" dated October 8, 2008. Further documents included a letter from the lender about the disbursement of the $1,050,000 paid for the property and documents related to the back-end of the "sale," including an agreement signed by Thomas to sell to an end-buyer.

Corona is an actual person and real estate investor with whom Thomas had worked previously. There is no indication that he was involved with the scheme or knew about the fraud Thomas was engineering at the back end of the transaction. Corona testified at trial that he never owned the home on South Langley and had no idea that Thomas was using his name for the sale. He stated that he never signed or initialed the sales documents; to the contrary, he testified, the signature on the document "looked like" Thomas's, and the buyer listed on the documents was a corporation that Thomas had used when actually buying property from him.

The defendants were caught when a targeted lender discovered that a person named "Chad Marks" who had requested transactional funding was not an employee of the title company he claimed to be. The lender contacted law enforcement and cooperated in an investigation, and Thomas was arrested immediately after completing the purported closing. The others' involvement came to light from there.

Thomas was ultimately convicted of eight counts of wire fraud and sentenced to serve 70 months in prison on each, to run concurrently, as well as one count of aggravated identity theft for which he was sentenced to 24 months' imprisonment, to run consecutively to the other counts. Chapman was convicted of four counts of wire fraud and sentenced to serve 65-month concurrent terms of imprisonment.

## II

On appeal, Thomas urges that the evidence was insufficient to support his conviction for aggravated identity theft. When a defendant challenges the sufficiency of the evidence

underlying a conviction, we will reverse only if no rational trier of fact, viewing the evidence in the light most favorable to the government, could have found the defendant guilty beyond a reasonable doubt. *United States v. Chapman*, 692 F.3d 822, 825 (7th Cir. 2012). This is an "extremely deferential" standard that presents a "nearly insurmountable hurdle" for a defendant. *United States v. Teague*, 956 F.2d 1427, 1433 (7th Cir. 1992).

The aggravated identity theft statute, 18 U.S.C. § 1028A(a)(1), reads:

> Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years.

To prove aggravated identity theft, the government must establish beyond a reasonable doubt that the defendant: 1) knowingly transferred, possessed, or used; 2) a "means of identification"; 3) that he knew belonged to another person, see *Flores-Figueroa v. United States*, 556 U.S. 646, 657 (2009); 4) with knowledge that such use was without lawful authority; 5) in connection with a qualifying felony.

Thomas challenges the sufficiency of the government's evidence only with respect to the first of these elements: knowing transfer, possession, or use. He was prudent to limit his appeal in this way, as the evidence easily supports the other elements. Forging someone's name on a document is surely a knowing use of that name without lawful authority, and a name is a "means of identification" within the mean-

ing of the statute. See *United States v. Spears*, 729 F.3d 753, 755 (7th Cir. 2013) (en banc). Thomas knew that Corona was a real person because they had done over a dozen property deals together. And wire fraud is a qualifying felony under 18 U.S.C. § 1028A(c)(5).

That leaves the "knowing use" element, which breaks down into two parts: whether Thomas was the person who filled out the false sales documents with Corona's name, and whether those documents were ever used or if the plan was abandoned before he did something with them. On the latter score, there can be no serious question that the evidence was sufficient to show that Thomas used the documents. The evidence presented at trial included a letter from the targeted transactional lender, First Funding, informing Orozco that Chicago Abstract would "receive funds totaling $1,050,000 on Wednesday October 8 for the real property interests … [at] S. Langley, Chicago IL 60636." The completed HUD-1 form and documents for Thomas's subsequent sale of the home provide further bases for the jury's finding that the documents were used.

The other question is whether Thomas was the person who filled out the false statements. We have no trouble concluding that it was permissible for the jury to find that he did so even though no person actually *saw* him fabricate the documents. Corona testified that the signature on the documents "looked like" Thomas's, and that details such as the name of the company used to purchase the property (Bosch & Cohen) matched prior transactions he had completed with Thomas. The jury could make its own comparison of that signature with other authentic examples of Thomas's signature in the record. See FED. R. EVID. 901(b)(3). Orozco, testify-

ing pursuant to his plea agreement, verified that all of the documents came from Chicago Abstract, and that Thomas was generally the person who provided information to transactional lenders in the scheme. The evidence is circumstantial, to be sure, but it is substantial, and direct evidence is not required to find an element of a crime beyond a reasonable doubt. See *United States v. Briscoe*, 896 F.2d 1476, 1505 (7th Cir. 1990).

All of this added up to enough evidence to convict Thomas of aggravated identity theft, and we therefore affirm that conviction.

## III

Chapman, like Thomas, has no squabble with the details of the wire fraud scheme. His main argument is that no evidence was introduced at trial to link him, the person sitting at the defendant's table, with the "Lamar Chapman" who participated in the scheme. In this connection, he places great weight on the fact that no witness made an in-court identification of him at trial.

In essence, Chapman is arguing that identification is unique among facts required for conviction, in that (in his view) it can be established exclusively through direct, in-court testimony, and never through circumstantial evidence. That is an interesting theory, but it is not one for which we find any support in the law. Though in-court identification is preferred to prove identity, it is not required if the defendant's identity can be inferred from the circumstances. See *United States v. Prieto*, 549 F.3d 513, 525 (7th Cir. 2008). A good example of circumstantial proof of identity can be found in *United States v. Weed*, in which we upheld the con-

viction without in-court identification of a person who was caught carrying some $28,000 in German and U.S. currency through customs after he answered "no" to the question whether he was carrying over $5,000 in currency. 689 F.2d 752, 753–54 (7th Cir. 1982). Despite the lack of in-court identification, we were satisfied that identity could be inferred because none of the witnesses ever hinted that the man on trial was not the same Weed that they had stopped with the currency. Both the prosecution and defense counsel referred to Weed as the person involved in the events, and defense counsel never objected to the prosecution's references to Weed as the accused. *Id.* at 755–56.

In the final analysis, the defendant's identity is nothing more or less than an element that must be established beyond a reasonable doubt in order to demonstrate guilt. That is, of course, a demanding standard, and if there were any reason to think that the "Chapman" in the courtroom was not the same "Chapman" involved in the scheme, the defense was free to make this argument, and the prosecution would have borne the risk of uncertainty. Identity, in short, is not a unique issue that can be proved only by someone pointing a finger at the defendant in the courtroom. Indeed, the Federal Rules of Evidence allow for a variety of means of proving identity: it is a permissible use of "other acts" evidence under Rule 404(b)(2), and Rule 901(b) lists several ways by which evidence can be linked to a defendant beyond direct witness testimony, including handwriting and voice comparisons, distinctive characteristics, and telephone records. If the evidence at trial was sufficient to permit jurors to find beyond a reasonable doubt that the man seated at the defense table was the same person referred to in the account of the offense, then there is no reason to overturn the jury's

conviction based on the government's alleged failure to prove identity.

Judged against that standard, a reasonable jury could find that Chapman's identity as the "Chapman" identified by the evidence was established beyond a reasonable doubt. Chapman's son-in-law testified that Chapman ran one of the "businesses" identified with the scheme (the firm of Alexander, Cavanaugh, and Block), and he identified Chapman's signature on a letter to one of the targeted lenders. The son-in-law never suggested that the person on trial was not his father-in-law, nor that there was any sort of identity mix-up. If there were anything to this point, Chapman could have cross-examined his son-in-law about it. The fact that he did not is one reason for the jury to infer, reasonably, that the correct "Chapman" had been brought before the court. Further evidence supporting that inference included telephone records from AT&T that linked Chapman's phone to one used in the scheme and provided a link to his address.

Another reason the jury had no cause to doubt that the right man was on trial was his lawyer's trial strategy, which was inconsistent with an identity-based defense. At one point during closing arguments, counsel argued that Chapman "g[ot] involved" in the scheme by speaking with one of the targets. He argued that Chapman was only trying to help her, not to delude her. This statement would make little sense if Chapman wanted the jury to believe that the government was charging the wrong person named "Chapman," or that Chapman's name was being used without his permission. We recognize that counsel's arguments are generally not evidence. See *United States v. Henry*, 2 F.3d 792, 795 (7th Cir. 1993). But unlike, for example, a characterization of

fact that does not conform to the evidence, counsel's version of events that is at odds with the defendant's own asserted theory of the facts comes close to being a factual concession. *Cf. United States v. Rusan*, 460 F.3d 989, 993–94 (8th Cir. 2006) (concessions made by counsel as part of trial strategy can be considered evidence). That said, we need not rely on the statement or decide whether counsel crossed the line dividing "zealous advocacy" and admissions. See *Ferroline Corp. v. General Aniline & Film Corp.*, 207 F.2d 912, 916–17 (7th Cir. 1953). The jury had sufficient grounds to infer Chapman's identity even without characterizing counsel's argument as a concession.

Proof of identity can be especially difficult when crimes can be committed from a remote location and without direct contact with the victim—a possibility that is likely to become increasingly common as technology continues to evolve. Chapman played his role in the scheme entirely from the other end of a cell phone or via correspondence, and so it would be all but impossible for any of the victims or investigators to take the stand and say that Chapman was the person they "saw" committing the wire fraud. Someone may be able to identify the person in the courtroom as Lamar Christopher Chapman, but that would hardly solve the problem of proving that he was the Lamar Chapman involved in the scheme; it would prove only that 1) this man is named Lamar Chapman and 2) the Lamar Chapman name was used in the scheme. With such crimes, juries will often be forced to rely on circumstantial evidence to determine that the defendant has been correctly identified. That evidence may be substantial, but it does require in the end that an inference be drawn. But, as we said at the outset, circumstantial evidence is entirely acceptable to prove even such a weighty

point as who pulled the trigger. It is also permissible to use for identity. In fact, given mounting scientific evidence about the unreliability of eyewitness identification, establishing or bolstering evidence of the defendant's identity through means other than eyewitness testimony may in many cases be desirable. See, *e.g.*, Hal Arkowitz & Scott O. Lilienfeld, *Why Science Tells Us Not to Rely on Eyewitness Accounts*, SCI. AM., Jan.-Feb. 2010, *available at* http://www.scientific american.com/article/do-the-eyes-have-it/?page=1 (last visited Aug. 14, 2014); Henry F. Fradella, *Why Judges Should Admit Expert Testimony on the Unreliability of Eyewitness Testimony*, 2006 FED. CTS. L. REV. 3. Finally, Chapman's case is an especially unattractive one in which to break new ground, since he did not raise this point at trial and did not present any argument to the jury that might have caused it to question the identity of the defendant.

The last issues before us are Chapman's due process arguments. He first claims that the government should be judicially estopped from prosecuting him (we assume) because it initially indicted Eddie J. Cox as part of the scheme, but later dismissed Cox from the indictment. This change of position on Cox, says Chapman, deprived him (Chapman) of due process. He does not indicate why that should be so. The requirements for judicial estoppel—a party taking two inconsistent litigating positions, successfully persuading a court to accept the earlier position before asserting the latter, and thereby deriving an unfair advantage if not estopped— are not met here. See *Wells v. Coker*, 707 F.3d 756, 760 (7th Cir. 2013) (estoppel requirements). No court ever accepted any position regarding Eddie Cox's role in the scheme. And there is certainly no rule requiring the government to bring all defendants initially charged into a case to trial or plead them

out, lest they be "estopped" from trying the other defendants. Here, for example, the government dropped Cox because it determined that it was Thomas using Cox's name on the relevant documents, rather than Cox himself. There is nothing to this point.

Finally, Chapman argues that the government failed to turn over evidence favorable to him, as required under *Brady v. Maryland*, 373 U.S. 83 (1963). He does not identify what this evidence is. He just thinks that it must exist because, he reasons, whatever caused the government to drop Cox from the case must also have been favorable to Chapman. He points to nothing, however, to support that hypothesis. And in any event, without a showing that certain evidence has been withheld there is nothing to support a *Brady* claim.

## IV

In today's world, as this scheme illustrates, frauds can be committed without ever meeting the victims face-to-face. The evidence here was sufficient to show, for Chapman, that the government had the right person in the dock. It also sufficed to prove the aggravated identity theft charge against Thomas. Finally, neither of Chapman's due process arguments has any merit. We AFFIRM the judgments entered against both defendants.