In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 12-3896 & 13-1034

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CONSTANTINO CEJAS and NICHOLAS CEJA,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 11 CR 0037 01/02 — **Jane E. Magnus-Stinson**, *Judge.*

ARGUED NOVEMBER 5, 2013 — DECIDED AUGUST 1, 2014

Before BAUER, WILLIAMS, and SYKES, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Brothers Constantino and Nicholas Cejas'[1] Valentine's Day drug dealing activities attracted

[1] The brothers' last names were spelled differently in the lower court and in their briefing before this court, specifically as "Constantino Cejas" and "Nicholas Ceja." But counsel explained in oral argument that the difference in the spelling was the result of an administrative error and that the correct spelling is "Cejas." We therefore use that spelling for both brothers throughout this opinion.

the attention of law enforcement officials. As a result, they were each convicted of conspiring to distribute drugs, possessing and distributing 50 grams or more of methamphetamine, and possessing a firearm to further their drug activity that day. Constantino was also convicted on charges related to his drug activities on February 8, 2011. The brothers appeal their convictions.

They argue that the video showing them at Brian Denny's home was inadmissible because the government did not properly authenticate it, but the evidence supports the finding that the video was an accurate depiction of the events that unfolded on February 14 and intermittent skips in the footage did not render the entire video inadmissible. Nicholas urges us to find that the video also should have been excluded because it unfairly prejudiced him, but nothing about the video would cause a reasonable jury to decide the case on an improper basis and the inferences the jury drew from it were reasonable. Nicholas's remaining arguments also fail because his actions on February 14 provided sufficient evidence to support his convictions. Constantino claims it was error to count his gun possession on February 14 as a second conviction under 18 U.S.C. § 924(c) because he continually possessed the gun from February 8, the date of the illicit activities underlying his first conviction, through February 14. But we have held that two predicate drug offenses involving distinct conduct can support two convictions under § 924(c). The jury convicted Constantino of two drug trafficking offenses, and found that he carried a gun during each. So as harsh as a mandatory twenty-five year sentence for a second conviction may be, it does not violate double jeopardy, and the conviction stands.

We affirm the brothers' convictions and Constantino's sentence.

## I. BACKGROUND

Brothers Constantino and Nicholas Cejas were indicted on charges related to drug activity that occurred on February 8, 2011 and February 14, 2011. Their illicit activities came to the attention of law enforcement officials in early 2011 during the Federal Bureau of Investigation's ("FBI") surveillance of the methamphetamine trafficking activities of Brian Denny and his neighbor Gregory Miller in Terre Haute, Indiana. FBI agents monitored and recorded the activities that occurred outside of Denny's and Miller's homes through the use of a pole camera mounted on a nearby utility pole, which allowed the agents to view and control the video feed from a remote location. Much like a convenience store surveillance camera, the pole camera captured a live feed, but the recording skipped every few seconds and did not produce a fluid, continuous video.

On February 8, 2011, FBI Special Agent Ed Wheele and other agents monitored the live video feed. The camera recorded Constantino, a security guard, and his son as they arrived at Denny's residence in Constantino's company car. The video showed the pair enter Denny's residence and exit the home a short time later. Denny's cooperation with the FBI later revealed that Constantino sold him methamphetamine while inside his home that day. Once the deal was done, undercover agents followed Constantino's car to a nearby restaurant and saw him carrying a handgun and a small shield on his hip. In an effort not to compromise the surveillance operation, the special agents did not arrest Constantino that day.

The pole camera showed Constantino arrive at Denny's residence once again on February 14, 2011. This time, his brother Nicholas was with him, driving Nicholas's pick-up truck with Constantino in the passenger seat and Constantino's son in the backseat. The pole camera recording showed the brothers leave the truck and Nicholas walk over to the toolbox attached to the bed of the truck and place his hand on the toolbox lid. The video records the toolbox lid open and then shut, with Nicholas standing beside it. But, as Nicholas points out, the feed does not show him take anything out of the box. The brothers then entered Denny's home. Denny later testified that, once inside, either Nicholas or Constantino placed four ounces of methamphetamine in his microwave and received $8,000 from him. After leaving the home and coming back within the pole camera's view, the brothers walked to the truck and both went to the truck's toolbox before driving away. Agent Wheele witnessed this activity via the live feed and ordered the on-site surveillance team to follow Nicholas's truck. When the law enforcement officers stopped them, Constantino showed the officers his security badge and admitted to possessing a firearm. The officers seized a loaded firearm from his waistband and found a second handgun and $8,000 cash in the toolbox.

Constantino and Nicholas were indicted for conspiring to supply Denny and other individuals in Indiana with over 500 grams of methamphetamine. In connection with their activities on February 14, 2011, they were charged with possession and distribution of 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). Constantino was also hit with identical charges for his actions on February 8, 2011,

as well as possession of a firearm by an alien illegally or unlawfully present within the United States, in violation of 18 U.S.C. § 922(g)(5). Constantino pled guilty on this last count, and the brothers went to trial on the remaining charges.

At trial, Denny testified against the brothers. He admitted purchasing methamphetamine from Constantino, known to him as "Tino," on five occasions in 2011 and testified that Nicholas accompanied Constantino to Denny's residence "at least once, possibly twice." According to Denny, he did not know which brother actually provided the drugs on the occasion when they came to his house together because they placed the drugs in his microwave out of his sight. Agent Wheele testified regarding his observations while monitoring the pole camera and confirmed that the recording that the government wanted to admit into evidence was an accurate depiction of what he saw from his remote location. The one-hour video recording from February 8 was admitted without objection. Nicholas objected to the admission of the February 14 video for lack of foundation and completeness, but his objection was overruled and the thirty-five minute video was admitted and the relevant clips shown to the jury.

The jury found the brothers guilty of all five counts. Nicholas was sentenced to 180 months' imprisonment, while Constantino received a sentence of 480 months' imprisonment. Constantino was sentenced to 120 months' imprisonment for the two distribution convictions, to run concurrently with his 120-month sentence for conspiracy and consecutively to his sixty-month sentence for possessing a gun during the drug deal on February 8. But the majority of his sentence came from the 300 months imposed pursuant to 18 U.S.C. § 924(c)(1)(C), which requires the imposition of a

twenty-five year sentence, to run consecutively to any other sentence, for a defendant's second conviction for possession of a firearm in furtherance of a drug trafficking crime. The brothers timely appealed their convictions, which we have consolidated for our review.

## II. ANALYSIS

The brothers both argue that the February 14 video was inadmissible because it was not properly authenticated. Nicholas lodges a second attack against the video, claiming it was unfairly prejudicial and that, without it, there was insufficient evidence to convict him. Constantino takes issue with his sentence, arguing that this second conviction for possessing a firearm in furtherance of a drug trafficking offense violated the Fifth Amendment's Double Jeopardy Clause, contravenes congressional intent, or the rule of lenity requires reversal.

### A. Video Was Properly Authenticated

We begin with Constantino and Nicholas's joint argument that the video showing them outside of Denny's residence on February 14, 2011 should not have been admitted at trial because the government did not establish a proper foundation to authenticate it. Our review of evidentiary rulings is for abuse of discretion, and we will reverse only if "no reasonable person could take the view adopted by the trial court." *United States v. Vargas*, 552 F.3d 550, 554 (7th Cir. 2008).

In laying the foundation for admitting the video, the government established through Agent Wheele's testimony that the pole camera produced accurate results throughout the investigation and the video offered in court was a fair

and accurate depiction of what he saw through the pole camera. After defense counsel objected, and the government elicited more details about the accuracy of the video and Agent Wheele's knowledge of the events shown in it, the judge overruled counsel's authentication objection and admitted the video into evidence. The brothers cannot show that the court abused its discretion in doing so.

A party seeking to admit an item into evidence—whether a document, weapon, photograph, audio or video recording, or other item—must first establish the item's genuineness. Fed. R. Evid. 901. This requires the proponent to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." *Id.* Of course it must also be relevant to an issue at trial. Fed. R. Evid. 401, 402. There is no question that the February 14 video was pertinent to the government's efforts to prove the brothers' guilt. The only question before us is whether the government satisfied Rule 901's authentication requirement.

The admitting party's burden of making a prima facie showing that the item is genuine can be satisfied in several ways, including through the testimony of a witness with knowledge or evidence showing that a process or system produces accurate results. Fed. R. Evid. 901; *see United States v. Fluker*, 698 F.3d 988, 999 (7th Cir. 2012). For video recordings, like tape recordings, the proponent should also show that the camera functioned properly, the operator was competent in operating the equipment, and the recording fairly and accurately represented the scene depicted. *Cf. United States v. Eberhart*, 467 F.3d 659, 667 (7th Cir. 2006) (finding, for audio tapes, that the government must show by clear and

convincing evidence that the recording is true, accurate, and authentic).

The brothers' argument that the video was not properly authenticated fails first because trial testimony from witnesses with knowledge supported the finding that the video was what the government claimed it was—a video showing the events that occurred outside of Denny's home on February 14. The evidence establishes that the video showed Denny's residence. Denny confirmed that Government Exhibit 3 was a picture of his house, and Agent Wheele's testimony established that the house in that photograph was the same as the one shown in the video. These witnesses had personal knowledge that the house was Denny's house. Denny's testimony also provided sufficient evidence for a reasonable jury to conclude that a drug buy went down with the brothers at his house on that day. He verified that he and "Tino" exchanged texts on February 14 discussing where to meet for that day's drug buy, and settled on meeting at his home. Agent Wheele then testified that he watched the events unfold as they were captured on the pole camera on February 14, which showed the brothers arrive at Denny's home in Nicholas's pick-up truck. After he saw the brothers pull out of the driveway, Agent Wheele ordered law enforcement officials to conduct a traffic stop and officers pulled them over as they were heading eastbound from Terre Haute (where Denny lives) to Indianapolis (where the brothers lived). The video had shown both brothers access the toolbox after exiting Denny's home, and the officers found a gun and $8,000 cash in the toolbox after they pulled them over. This evidence corroborates the events the video recorded and supports a finding that it was a true and accurate representation of what happened outside Denny's home on February 14. *See*

*Eberhart*, 467 F.3d at 667; *cf. United States v. Carrasco*, 887 F.2d 794, 802 (7th Cir. 1989) (foundation is properly laid for a tape recording when there is corroborating eyewitness testimony).

The brothers attempt to attack the reliability and accuracy of the pole camera recording, but their argument is unsupported by the record. Agent Wheele confirmed that the pole camera was monitored throughout the investigation and was consistently producing accurate results. *See Eberhart*, 467 F.3d at 667. Additionally, the video noted the precise date and time of the recordings, which were consistent with the activities that Denny testified occurred on those dates. *Cf. Griffin v. Bell*, 694 F.3d 817, 826–27 (7th Cir. 2012) (affirming exclusion where video did not have date or time stamp). Trial testimony that Agent Wheele worked with many pole cameras during his tenure as a special agent also made it clear that he was qualified to competently monitor the camera, as well as testify regarding its general use and accuracy. *See United States v. Rembert*, 863 F.2d 1023, 1026 (D.C. 1988) (finding authenticity can be established by testimony regarding camera use, quality, and reliability). This evidence, along with Agent Wheele's testimony that the video recording presented in court was a fair and accurate representation of the recording of events he observed on February 14, was sufficient for Rule 901's purposes. *See Fluker*, 698 F.3d at 999 ("Only a prima facie showing of genuineness is required; the task of deciding the evidence's true authenticity and probative value is left to the jury.").

The brothers give us no sound reason to doubt the video's authenticity. They do not argue, for example, that the scenes depicted in the video did not occur outside of Den-

ny's home, or that they were not the individuals seen in the video. They fail to give us any reason to believe the video was spliced, or improperly altered in any way, or that the pole camera did not accurately record the events as they unfolded. *See Bell*, 694 F.3d at 826–27 (affirming decision not to admit video where proponent could not say what type of device was used or whether video was altered); *Carrasco*, 887 F.2d at 802 (tape admissible where there is evidence it was not altered improperly while in custody). They simply argue that Agent Wheele was not the proper person to establish the genuineness of the video because he watched a live feed of the video and did not personally witness the events the recording captured. We reject this argument. As long as the government provided a convincing reason to believe that the video was a fair and accurate depiction of the events that unfolded on February 14, Rule 901 was satisfied. *See Fluker*, 698 F.3d at 999 (authenticating email on circumstantial evidence alone where no witness saw the email's author draft the email); *Eberhart*, 467 F.3d at 667; *Rembert*, 863 F.2d at 1027 ("Even if direct testimony as to foundation matters is absent … the contents of [an item] itself, together with such other circumstantial or indirect evidence as bears upon the issue, may serve to explain and authenticate [the item] sufficiently to justify its admission into evidence." (quoting *United States v. Stearns*, 550 F.2d 1167, 1171 (9th Cir. 1977))). Witnesses' testimony established that the house in the video was Denny's house, and explained how the camera worked, that it produced accurate results, and that the clips in court were consistent with what the live feed showed as the events unfolded. Therefore, the court did not abuse its discretion in admitting it. *See United States v. Westmoreland*, 312 F.3d 302, 310–11 (7th Cir. 2002) (tape recording properly authenticated

where testifying agent listened to the conversation via headphones at the time the conversation took place).

The brothers also argue that the recording's tendency to intermittently skip a few seconds at a time makes the recording unreliable. This argument also fails. "[R]ecordings that are partially unintelligible are admissible unless the unintelligible portions are so substantial as to render the entire recording untrustworthy." *United States v. Larkins*, 83 F.3d 162, 167 (7th Cir. 1996) (dealing with tape recordings). The video in this case skipped a few seconds at a time, totalling about thirty seconds over the course of the entire thirty-five minute video. The few seconds missing periodically between stretches of properly recorded video footage did not render the video unintelligible, unreliable, or irrelevant. *Id.* at 168 (holding that unintelligible parts did not make tapes inadmissible, but went to their weight as evidence). Since the skipping of the video did not prevent the jury from understanding the course of events in this case, the missing seconds did not require exclusion of the entire video.

Because the video was relevant to establish defendants' presence at the site of a drug deal, trial testimony established a prima facie showing that the video was genuine, and the skipping nature of the video did not make it incomprehensible, the court did not abuse its discretion in admitting the video.

### B. Video Not Barred by Rule 403

Nicholas finally challenges the video's admission by arguing that it unfairly prejudiced him and should have been excluded under Federal Rule of Evidence 403. This argument is without merit because the video's probative value was not

substantially outweighed by the danger of unfair prejudice or confusing the jury. *See* Fed. R. Evid. 403.

The pole camera video was relevant to the issue of Nicholas's involvement in the February 14 drug transaction as it showed Nicholas drive up to Denny's residence around the date and time of the drug deal. It shows Nicholas leave the truck and walk over to the toolbox attached to it. It shows the toolbox lid open, while Nicholas stands beside it, and then closed with his hand on top of it. The video then shows Nicholas walking towards Denny's home and exiting a few minutes later. Lastly, the video shows both Nicholas and Constantino accessing the toolbox before Nicholas drives away. When FBI agents pulled the brothers over a few minutes later, they found $8,000 and a firearm inside Nicholas's toolbox. The video was highly probative to showing that Nicholas was part of the February 14 drug deal.

But even highly probative evidence is subject to exclusion if it is significantly more prejudicial to the defendant. "Evidence is unfairly prejudicial if it induces the jury to decide the case on an improper basis rather than on the evidence presented." *United States v. Conner,* 583 F.3d 1011, 1025 (7th Cir. 2009). Nicholas again hangs his hat on the fact that the video "was missing more than 30 seconds of accumulative footage." He highlights that the video did not provide any visual evidence that he removed anything from the toolbox or carried anything in his hands as he entered Denny's house. Defense counsel was free to make those arguments in his closing argument, but the jury was equally free to draw reasonable inferences from the video and other admitted evidence. *See United States v. Keskes*, 703 F.3d 1078, 1088 (7th Cir. 2013) ("[T]he jury can draw reasonable infer-

ences and use their common sense in assessing the evidence."). It was reasonable to infer from a video showing Nicholas open and close the toolbox that he pulled something out of it. The firearm found in the toolbox soon after Nicholas again accessed it supports the inference that the "something" he pulled out was actually a gun. Common sense would counsel him not to carry the gun or drugs in plain view, so we decline to draw much from the fact that he carried nothing in his hands. There is nothing about the video that would lead the jury to base its decision on anything other than the evidence presented.

Moreover, the video was not likely to confuse or mislead the jury. Nicholas argues that the video misled the jury into believing that his "mere presence" implicated him in the crimes of conspiracy and possession of a firearm. But the evidence suggested that Nicholas was more than just present at the scene. In addition to driving to Denny's residence, he was in the house when the drug deal occurred and appeared to access the toolbox where, immediately afterwards, a large amount of money and a gun were found. A reasonable juror could conclude that Nicholas actively participated in the drug deal on February 14. The video was properly admitted because it was probative of Nicholas's guilt, and the probative value was not substantially outweighed by the danger of unfair prejudice or misleading the jury.

### C. Sufficient Evidence to Convict Nicholas

Nicholas's final argument is that there was insufficient evidence to support his convictions for conspiracy, possession and distribution of methamphetamine, and possession of a firearm in furtherance of a drug trafficking crime. Faced with this type of challenge, we review to "determine wheth-

er any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt when the evidence is viewed in the light most favorable to the government." *Larkins*, 83 F.3d at 165. We will reverse only if "the record is devoid of evidence from which a jury could find guilt." *United States v. Hach*, 162 F.3d 937, 942 (7th Cir. 1998). This standard is as difficult as it sounds, and presents a "nearly insurmountable hurdle" for defendants. *United States v. Morris*, 576 F.3d 661, 665–66 (7th Cir. 2009).

Nicholas's challenge does not clear the hurdle. In order to establish that Nicholas conspired with Constantino to possess and distribute drugs, the government had to prove beyond a reasonable doubt that Nicholas knowingly and intentionally agreed to join Constantino's criminal enterprise. *See United States v. Johnson*, 592 F.3d 749, 754 (7th Cir. 2010). Direct evidence of an agreement is not required; rather, the charge may be proven through circumstantial evidence regarding the relationship of the parties, their overt acts, and their overall conduct. *Id.* at 754–55. Moreover, while mere association with an individual involved in a criminal enterprise is not sufficient, "presence or a single act will suffice if circumstances show that the act was intended to advance the ends of the conspiracy." *United States v. Crowder*, 36 F.3d 691, 695 (7th Cir. 1994).

The evidence at trial was sufficient to support Nicholas's conspiracy conviction. First, he drove from Indianapolis to Terre Haute for a quick encounter at Denny's residence. Second, witnesses testified that most people drove straight into Denny's driveway, but Nicholas chose to back his truck into the driveway. A reasonable jury could interpret this move as indicative of his intent to hide the toolbox from passersby

and put the car in a position to facilitate a quick getaway if things went awry. The evidence that Nicholas went to the toolbox, entered Denny's residence where drugs were sold, and again approached the toolbox upon exiting—the same toolbox where a large amount of cash and a firearm were found soon thereafter—is sufficient evidence for a reasonable jury to determine that he was guilty of joining Constantino's criminal enterprise. *See United States v. Green*, 258 F.3d 683, 695 (7th Cir. 2001) (noting that courts of appeals do not re-weigh the evidence presented to the jury and will reverse only if the evidence, "regardless of how it is weighed," is insufficient to support the conviction).

Nicholas's conviction for possession of a firearm in furtherance of a drug crime also rests on solid ground. 18 U.S.C. § 924(c)(1)(A) provides that "any person who, during and in relation to any crime of violence or drug trafficking crime … uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm" shall be subject to mandatory penalties. For this offense, "possession can be either actual or constructive." *Morris*, 576 F.3d at 666.

The evidence supports a finding that Nicholas actually possessed the gun found in the truck's toolbox. As previously mentioned, the video showed Nicholas standing by the toolbox when it was opened and closed both before and after the drug deal, and a gun was found inside the toolbox when the brothers were stopped a few minutes after leaving Denny's home. His brother Constantino already had one gun on his waistband, so it is hard to understand why he would need another and plausible for the jury to believe, based on this evidence, that it was Nicholas who carried that second gun into Denny's house.

But even if Nicholas did not take physical possession of the gun, he at least had constructive possession of it. "Constructive possession is a legal fiction whereby a person is deemed to possess contraband even when he does not actually have immediate, physical control of the object." *United States v. Griffin*, 684 F.3d 691, 695 (7th Cir. 2012). To establish constructive possession, the government must demonstrate either that a defendant had exclusive control over or a substantial connection to the property where the contraband was found sufficient to allow the inference that the defendant exercised dominion and control over objects found on the property. *Id.*; *Morris*, 576 F.3d at 666–68 (collecting cases). Nicholas owned and controlled not only the truck, which read "Nick's Landscaping" on the side, but also the toolbox attached to it. His ownership indicated his control, along with the fact that he accessed the toolbox immediately before and after the drug deal. That Constantino had access to it as well does not change our analysis because Nicholas had substantial control over it. *See United States v. Kitchen*, 57 F.3d 516, 521 (7th Cir. 1995) ("Constructive possession may be either sole or joint."); *cf. United States v. Herrera*, 757 F.2d 144 (7th Cir. 1985) (no substantial connection where there was no evidence defendant exercised control over a locked footlocker in a house he had just exited). And the gun, found in the toolbox, was also within his control. *See United States v. Newman*, --- F.3d ---, 2014 WL 2736091, at *1 (7th Cir. 2014) ("[C]onstructive possession means the *authority* to exercise control."); *United States v. Caldwell*, 423 F.3d 754 (7th Cir. 2005). This constructive possession of the gun in the toolbox, combined with the fact that the gun was found atop what could reasonably be interpreted as drug profits ($8,000 in cash) right after the drug deal went down, is sufficient to es-

tablish that he possessed the gun in furtherance of the drug crime. *United States v. Seymour*, 519 F.3d 700, 715 (7th Cir. 2008) (listing "proximity to drugs or drug profits" and "the time and circumstances under which the gun is found" as factors to consider in determining whether gun was possessed in furtherance of drug crime).

Nicholas's objections to his conviction for possession with intent to distribute and distribution of methamphetamine fare no better. Similar to the firearm possession charge, actual or constructive possession of narcotics is sufficient to support a conviction under 21 U.S.C. § 841(a). *United States v. Garrett*, 903 F.2d 1105, 1112 (7th Cir. 1990); *see also Morris*, 576 F.3d at 666. Here, there is no definitive evidence that Nicholas was the one who physically possessed the drugs sold to Denny on February 14. But whether Nicholas touched or controlled the drugs is not dispositive since "any person who knowingly aids … the commission of an offense may be found guilty of that offense if he knowingly participated in the criminal activity and tried to make it succeed." Seventh Circuit Pattern Jury Instruction 5.06 (2012 Ed.); *see* 18 U.S.C. § 2(a) ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."); *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949). In other words, he who aids and abets another in committing a criminal offense is guilty of that offense just as if he had committed it himself. *See Rosemond v. United States*, 134 S. Ct. 1240, 1245 (2014) ("§ 2 reflects a centuries-old view of culpability: that a person may be responsible for a crime he has not personally carried out if he helps another to complete its commission."). "And an indictment need not charge the [aiding and abetting offense] separately." *Newman*, 2014 WL

2736091, at *2. The government argued at trial that Nicholas was guilty of Count IV because he aided and abetted its commission and the court instructed the jury on this theory of liability after trial.

Culpability for the substantive offense of possessing and distributing narcotics attaches when the defendant affirmatively acts to further the offense with the intent of facilitating the commission of the offense. *See Rosemond*, 134 S. Ct. at 1245. Precedent sets a low bar for satisfying the "affirmative act" requirement, which is met when the defendant actively and knowingly participates in carrying out *any* part of the felonious conduct, irrespective of how minimal. *Id.* at 1245–46 (discussing history in detail and recognizing that "every little bit helps" if it aids crime as a whole). The defendant does not have to participate in every element of the offense. *Id.*; *United States v. Woods*, 148 F.3d 843, 850 (7th Cir. 1998). Nicholas drove to Denny's home, backed his truck into his driveway, and entered Denny's home with Constantino and, according to the jury's reasonable determination, a gun. These actions solidly satisfy the affirmative act requirement for aiding and abetting the drug offense.

But this does not throw open the doors of liability as wide as one might imagine, for satisfying the affirmative act element is not enough on its own to support a conviction. Instead, the government must also show that the defendant acted with the intent to facilitate the crime. *Rosemond*, 134 S. Ct. at 1248–1250. Unlike the affirmative act prong of aiding and abetting liability, "the intent must go to the specific and entire crime charged." *Id.* at 1248. That element is satisfied "when a person actively participates in a criminal venture with full knowledge of the circumstances constituting the

charged offense." *Id.* at 1248–49. The evidence indicating that Nicholas backed his truck into Denny's driveway and carried a firearm into Denny's home suggests that Nicholas was aware of the plan to distribute drugs at Denny's home. Nicholas, having denied carrying a gun—an assertion the jury reasonably rejected—has offered no alternative reason for entering the house strapped, and we can discern none. And there can be no distribution without possession, so if Nicholas knew about the plan to distribute the drugs, he necessarily must have known who possessed the drugs, whether himself or Constantino.

The gun evidence suggests that Nicholas was aware of the plan to distribute drugs to Denny and acted to make the plan succeed. There was therefore sufficient evidence to convict him for possession with the intent to distribute and distribution of the methamphetamine that Denny received when the brothers came to his house on February 14.

### D. No Error in Constantino's Second Conviction for Gun Possession or Resulting Sentence

We now turn to Constantino's final challenge. He was convicted on two drug trafficking charges for his involvement in the drug deals on February 8 and February 14 and two counts of possessing a gun in furtherance of a drug offense, one for each drug deal. Constantino was sentenced to five years' imprisonment for the first firearm conviction and twenty-five years' imprisonment for the second, each to run consecutive to his sentence for the drug trafficking charges,

pursuant to 18 U.S.C. § 924(c)(1).[2] Constantino argues that the second firearm possession conviction violates double jeopardy and Congressional intent or that lenity requires reversal.

Even though he possessed a gun during each drug deal, Constantino asserts he only violated § 924(c)(1) once because his possession of the gun was continuous and uninterrupted, and convicting him on two separate counts violated the Double Jeopardy Clause. Because Constantino did not raise this double jeopardy argument before the district court, our review is for plain error and Constantino must show that the district court not only erred, but also that the error was plain, affected his substantial rights, and seriously called into question the fairness, integrity or public reputation of his trial. *United States v. Warren*, 593 F.3d 540, 544 (7th Cir. 2010). He cannot make this showing.

The Fifth Amendment's Double Jeopardy Clause provides that "[no] person [shall] be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. Amdt. V. Because of its protections, criminal defendants may not be exposed to a second prosecution for the same offense after conviction. Nor may they be hit with "multiple punishments for the same offense imposed in a single pro-

---

[2] 18 U.S.C. § 924(c)(1)(A) reads:

> [A]ny person who, during and in relation to any crime of violence or drug trafficking crime …, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime … be sentenced to a term of imprisonment of not less than 5 years … .

ceeding." *Jones v. Thomas*, 491 U.S. 376, 381 (1989). The clause therefore prohibits the executive branch from doubling down, bringing multiple prosecutions or seeking successive punishments against a defendant for the *same criminal offense. United States v. Dixon*, 509 U.S. 688, 696 (1993); *McCloud v. Deppisch*, 409 F.3d 869, 873 (7th Cir. 2005).

Constantino's argument fails because the punishment that resulted from his two § 924(c) convictions was not based on the same criminal conduct. Rather, he was convicted for possessing a gun during his drug activity on February 8 and separately for possessing a gun during his criminal conduct on February 14. He argues that he only violated § 924(c) once because he says his possession of the gun was continuous and uninterrupted throughout those seven days. He cites several cases interpreting 18 U.S.C. § 922(g) for the proposition that, where the same gun is involved, the defendant must relinquish and then reacquire actual and constructive possession of the gun to be charged twice with unlawful possession of the gun. *See, e.g., United States v. Ellis*, 622 F.3d 784, 794 (7th Cir. 2010). Constantino contends that because he possessed the gun as part of his security job, and never relinquished and reacquired possession of it, he could only be charged once without running afoul of the Double Jeopardy Clause.

But to compare § 922(g) and § 924(c)(1) is to confuse apples with oranges. The former, for its part, makes it a crime for enumerated groups of people to possess any firearm, such as felons, fugitives, and aliens unlawfully present in the United States. *See* 18 U.S.C. § 922(g). Our holdings that multiple § 922(g) firearm possession convictions and sentences violate double jeopardy where the defendant's possession of

the same firearm is uninterrupted are premised on the fact that the unit of prosecution in § 922(g) cases is the gun possession itself; one gun (or several guns simultaneously) possessed one time sustains one conviction. *See United States v. Cureton*, 739 F.3d 1032, 1041 (7th Cir. 2014); *United States v. Conley*, 291 F.3d 464 (7th Cir. 2002). Section 924(c)(1), on the other hand, prohibits possessing a gun during a drug trafficking offense. *See* § 924(c)(1). Because the statute ties the gun possession charge to the underlying drug transaction, the unit of prosecution is each predicate offense in which a firearm is carried, used, or possessed with the intent to further the drug crime, as long as there is some meaningful difference in the conduct that led to each predicate offense. *Cureton*, 739 F.3d at 1041–43 (finding two predicate offenses supported only one § 924(c) conviction where the two predicate offenses were committed simultaneously and without any distinction in conduct); *United States v. Paladino*, 401 F.3d 471, 478 (7th Cir. 2005); *United States v. Cappas*, 29 F.3d 1187, 1190 (7th Cir 1994) ("[S]eparate convictions are permissible [when] … jury … connect[s] each gun use to a *separate* predicate offense.").[3] So in a case involving two drug offenses based on separate and distinct conduct, a defendant's "car-

---

[3] Constantino disagrees with our interpretation and urges us to find that the unit of prosecution is "the possession, not the predicate drug trafficking crimes," Appellant Br. p. 23, or at the very least that the statute is ambiguous and the rule of lenity requires us to interpret it in his favor. But in our view, the statute unambiguously authorizes a separate conviction for each distinct predicate offense in which a firearm is used, carried, or possessed in furtherance of the crime, *Cureton*, 739 F.3d at 1043; *Cappas*, 29 F.3d at 1190, so the rule of lenity does not apply, *Chapman v. United States*, 500 U.S. 453, 463 (1991).

rying of a gun during each of them constitute[s] two viola-
tions of section 924(c)." *Paladino*, 401 F.3d at 478–79.

Here, Constantino was convicted of two separate drug
offenses, occurring on February 8 and February 14. The jury
found that he possessed a gun in furtherance of each offense.
Therefore, his two convictions for gun possession related to
two separate drug offenses, not the same offense as prohibit-
ed by the Double Jeopardy Clause. *See id.* (finding separate
drug offenses where defendant conducted two separate
drug transactions on the same day). It is irrelevant that the
same gun was used in each drug transaction or that Con-
stantino had continuous possession of it; all that matters is
that *a* firearm was involved in furthering each distinct drug
offense. *See id.* at 478 (concluding that whether defendant
used different guns or the same one was "of no signifi-
cance").

But, Constantino argues, allowing continuous possession
to constitute separate possession-in-furtherance charges
leads to absurd results. He points out that a defendant who
sells drugs to multiple customers at different times on the
same day while possessing a gun could be subjected to mul-
tiple consecutive convictions under § 924(c), while an indi-
vidual who sells the same quantity of drugs to one customer
would not. Constantino is right that these hypothetical de-
fendants could end up with two very different sentences, but
this disparity is a result of Congress's focus in passing §
924(c). The provision resulted from Congress's recognition
that "[t]he presence of guns … during a drug transaction
may increase the likelihood of violence erupting in what are
often already volatile situations," *United States v. Dickerson*,
705 F.3d 683, 689 (7th Cir. 2013), and was passed to target

defendants who choose to involve weapons in their drug crimes. *See, e.g., Muscarello v. United States*, 524 U.S. 125, 131–32 (1998) (citing the bill's sponsor's statement that the provision sought "to persuade the man who is tempted to commit a Federal felony to leave his gun at home"); *United States v. Diaz*, 592 F.3d 467, 473–74 (3d Cir. 2010). The amount of drugs is not the dispositive factor; rather it is whether a firearm was used, carried, or possessed to further a drug crime that matters.

The resulting twenty-five year sentence for Constantino's second gun possession conviction, as harsh as it may seem, is exactly what § 924(c) demands. "In the case of a second or subsequent conviction under this subsection, the person shall be sentenced to a term of imprisonment of not less than 25 years" and "no term of imprisonment imposed … under this subsection shall run concurrently with any other term of imprisonment imposed … ." § 924(c)(1)(C)-(D). Congress made a "'plain statement of its intent to stack punishments in … § 924(c)(1).'" *United States v. Seawood*, 172 F.3d 986, 989 (7th Cir. 1999) (quoting *United States v. Overstreet*, 40 F.3d 1090, 1095 (10th Cir. 1994)). But we also recognize the authority of the United States Attorneys to exercise prosecutorial discretion and serve the interests of justice in deciding what charges to bring against a defendant. Given the facts of this case, including that Constantino was a new offender and did not actually use the gun he possessed during his drug crimes, we do not understand the prudence of charging him with two § 924(c) offenses. But we do not have the authority to step into the place of the prosecutors and use the discretion they failed to exercise. Regardless of what we may think of the decision to charge Constantino twice under § 924(c), the charges do not violate double jeopardy or run afoul of

Congressional intent and were permissible. The jury found that Constantino made a choice to have a gun with him to further the execution of each of his drug deals on February 8 and 14, so the two convictions and his sentence stand.

### III. CONCLUSION

The convictions and sentences of Constantino and Nicholas Cejas are AFFIRMED.