In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 16-2053

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

WANDA SHORTER,

*Defendant-Appellant*.

---

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:14-cr-32 — **Jon E. DeGuilio**, *Judge*.

---

ARGUED FEBRUARY 8, 2017 — DECIDED NOVEMBER 1, 2017

---

Before WOOD, *Chief Judge*, FLAUM, *Circuit Judge*, and
CONLEY, *District Judge*.*

CONLEY, *District Judge.* In 2014, following investigations by
the Indiana Attorney General and FBI, a grand jury issued a
four-count indictment for Medicaid fraud against defendants
Wanda Shorter and her company, Empowerment Non-Emer-
gency Medical Transport, Inc. ("Empowerment"). Specifically,

---

* Of the Western District of Wisconsin, sitting by designation.

Shorter and Empowerment were charged with one count of health care fraud in violation of 18 U.S.C. § 1347, and three counts of misusing a means of identification in violation of 18 U.S.C. § 1028A. After a petit jury found her guilty on all four counts, Shorter filed this direct appeal, challenging the indictment, the admission of certain evidence at trial and the sufficiency of the evidence as a whole. For the reasons that follow, we affirm.

## I.   Procedural History

### A.  Background

In early 2011, Shorter, already a licensed nurse, formed Empowerment to provide transportation services to Medicaid clients. She was its sole shareholder. Following a single training session on Indiana Medicaid's billing protocols in April 2011, Shorter began submitting invoices for Empowerment's services.

Indiana Medicaid provides reimbursements for health related transportation services to eligible patients. The provider of those services agrees to follow Medicaid's billing policies and to seek reimbursement for only medically necessary and truly rendered services. To ensure compliance, transportation providers must maintain trip tickets that include the recipient's name and identification number, date of transport, type of services rendered, whether it was one-way or round trip, and the mileage driven.

Each type of service is assigned a Medicaid code used for reimbursement.[1] The service provider submits the applicable codes to Medicaid, which reimburses according to set rates specific to the type of service provided. For instance, Medicaid reimburses twice as much if the patient is wheelchair-bound, and it provides additional reimbursement when an attendant rides along or when rides are more than 20 but fewer than 100 miles round-trip. Along with a few other individuals working under Shorter's direction, she continued to bill and receive Medicaid reimbursements using these codes until early 2014.

## B. Indictment

On March 12, 2014, the grand jury named Shorter and Empowerment as defendants in a four-count indictment. Count 1 alleges that between 2011 and 2014, Shorter and Empowerment knowingly engaged in a scheme to defraud Indiana Medicaid in violation of § 1347 by requesting payment for services and transportation never actually provided, or if provided, for higher payments than justified by actual services

---

[1] The codes relevant to the convictions here are:
- A0130: "nonambulatory" patient who must be transported in a wheelchair;
- T 2003: "ambulatory" patient who does not need to ride in a wheelchair;
- A0130 TK: attendant or parent who travels with a nonambulatory patient;
- A0130 TT: nonambulatory patient the provider picks up when a Medicaid client is already in vehicle;
- A0425 U5: transport of a nonambulatory patient for more than 20, but less than 100, miles round-trip.

and transportation provided. Counts 2 through 4 of the indict-ment charged the defendants with violating § 1028A by knowingly using "without lawful authority a means of iden-tification of another person during and in relation to health care fraud … and wire fraud." In Count 2, defendants were charged with fraudulently using the identification of "C.C. (different person from Counts 3-4)" in August 2012, while Counts 3 and 4 charged them with fraudulently using the identification of "C.C." in June and August 2013, respectively. At no time before trial, did Shorter challenge the sufficiency of the indictment.

### C. Evidence at Jury Trial

To prove the allegations in Count 1, the government sub-mitted evidence of: (1) Shorter's personal involvement in Em-powerment's billing practices; (2) the results of a September 2013 Indiana Attorney General Investigation into Empower-ment's billing practices; (3) an October 2013 FBI search of Em-powerment's records; and (4) the experiences of Empower-ment employees and of clients who used its services. As for Shorter's personal involvement, an FBI agent testified that Shorter confirmed during an interview her ownership of Em-powerment, as well as her training and comfort with Medi-caid billing. Shorter also told the agent that her aunt, Annette Gates, did some of Empowerment's Medicaid reimbursement requests between April 2012 and October 2013. Moreover, there was substantial evidence that Shorter personally trained Aunt Annette and a cousin, Lakesha Gates, on how to prepare Medicaid bills.

Specifically, both Annette and Lakesha testified that: (1) they submitted bills for Medicaid reimbursement in accordance with Shorter's instructions; (2) they had no knowledge about the Indiana Medicaid billing process before beginning work for Empowerment; and (3) they received no formal training beyond Shorter's instructions. They both further testified that Shorter taught them to use the same four codes for every trip: transport of a non-ambulatory patient, when another client is already in the vehicle, with an attendant and more than 20 miles round-trip.

Multiple agents involved in the Indiana Attorney General's September 2013 investigation also testified to arranging for transportation services with Empowerment using fake names but real Medicaid identification numbers. Each agent arranged for and took one-way trips without use of a wheelchair or presence of an attendant. Nevertheless, Empowerment billed each of these transports as round-trip for a wheelchair-bound client with an attendant. Similarly, there was testimony that trips of 3.4 miles and 4.2 miles were billed by Empowerment for 77 miles and 40 miles, respectively. An agent further testified that despite cancelling a trip, Empowerment later billed for the 40-mile transport of a wheelchair-bound client with an attendant. Finally, the agents testified that Empowerment submitted bills for their transport in June, July, and August 2013, well before they began requesting transportation.

As further proof of Count 1, twelve former clients and three former drivers testified about their actual experiences with Empowerment. This testimony was also inconsistent with Empowerment's actual billings for those same transports as reflected in government summary exhibits. Among other

things, these exhibits showed that Empowerment coded transports to claim a wheelchair-bound patient, round-trips, and attendant trips, while only one client, Chitika Cox, testified that she used a wheelchair, and then only for one week at the end of 2013. Clients further testified that their trips with Empowerment were often one-way, not round-trips as coded, and only two of the twelve clients testified to using an attendant.[2] This client testimony was confirmed by former Empowerment drivers. For example, one former driver testified that in two months driving for Empowerment, she had three to five wheelchair patients and one patient who needed an attendant. A second driver testified that between five and ten percent of her riders needed an attendant, while a third driver testified that attendants were not frequently present during trips. Yet for each trip, defendants submitted reimbursement requests seeking compensation for these additional services.

To prove Counts 2-4, the government submitted additional testimony and documentary evidence with respect to the "C.C." references in the indictment, including that "C.C." stood for Cassamdra Cook in Count 2, and for Chitika Cox in Counts 3 and 4. Without objection, the government also submitted Exhibits 18 and 20, which included Empowerment's trip tickets from Cook and Cox trips, respectively, as well as

---

[2] In addition, clients testified about the poor quality of their transports by Empowerment, including that their rides were often late or never showed up, and that Empowerment's vans were shoddy and sometimes broke down. Drivers similarly testified that the vans were in poor condition. This was consistent with driver testimony that they rarely had contact with Shorter; and their payroll check bounced at times. Shorter admitted that she never reconciled the billings and that she used the Medicaid reimbursement money to buy a new house and car.

Exhibits 35 and 40, which were summary charts, respectively entitled "Empowerments Billings for Chitika Cox" and "Empowerment's Billings for Casamdra[sic] Cook."

At trial, Chitika Cox acknowledged using Empowerment to transport her to dialysis appointments three times a week, but testified that except for one week at the end of 2013, she never used a wheelchair, and she never traveled with an attendant. For five of her scheduled trips during the period that Empowerment billed Indiana Medicaid for this transport, Cox cancelled altogether, and Empowerment did not drive her to dialysis. Specifically, Empowerment's May 6, 17, 22, and June 10 and 19, 2013, trip tickets showed that Cox cancelled, and her medical records confirm that she did not appear for her medical appointment on those dates. However, the government submitted evidence that Empowerment billed each of those dates as round-trip, wheelchair trips with an attendant. Similarly, the trip tickets from May 1, 10, 29 and June 5, 2013, show that Cox either did not appear or did not list any mileage, but Empowerment billed those trips as round-trip, wheelchair transports as well.

In addition, Cook testified that she used Empowerment on a regular basis for transport to a standing appointment on Tuesdays at 5 p.m., but that she did not use a wheelchair. Because her mother would always pick her up, Cook also testified that these Tuesday trips were always one-way. Nevertheless, Empowerment billed two of these appointments as wheelchair trips on the wrong dates, with Cook as both a primary *and* secondary passenger.

For her part, defendant Shorter did not attempt to defend Empowerment's billing practices. Instead, she opted to take the stand in an attempt to divorce herself from her company's

billing failures by emphasizing that she created Empowerment to offer services to the very type of people that she originally became a nurse to serve, while admitting that she did not keep good records, which lead to the billing errors here. In particular, Shorter denied ever "willfully and intentionally and fraudulently, knowingly and purposely" billing for things to which she was not entitled.

### D. Charge to Jury

At the close of the government's case, Shorter moved for acquittal under Federal Rule of Criminal Procedure 29. In doing so, Shorter's counsel did not challenge the language of the indictment. In fact, he conceded that the government "identified Chitika Cox and Cassamdra Cook as the 'CC' individuals involved in the indictment," and that there was evidence Empowerment submitted bills without their authorization, but argued that no evidence tied Shorter to those billings, nor was there evidence of her intent to defraud Indiana Medicaid. The court denied Shorter's Rule 29 motion as to all of the counts, concluding that there was "ample evidence of fraudulent billing" and sufficient evidence with respect to the identity theft counts. At the close of the evidence, Shorter renewed her Rule 29 motion, which was denied for the same reasons.

The court then instructed the jury on the law, including the following instruction as Shorter had proposed: "A person who acts on behalf of a corporation also is personally responsible for what she does or causes someone else to do. However, a person is not responsible for the conduct of others performed on behalf of a corporation merely because that person is an officer, employee, or other agent of a corporation." Obviously agreeing with the government's view of the evidence, the jury

returned a guilty verdict on all counts, and the district court sentenced Shorter to 75 months of imprisonment.

## II. Discussion

As to all counts of conviction, the defendant challenges the district court's admission of certain evidence as irrelevant or unduly prejudicial under Federal Rules of Evidence 401 or 403. Specifically, defendant challenges the admission of evidence that: (1) Empowerment's checks sometimes bounced; (2) Empowerment's vehicles and equipment were in disrepair; (3) Empowerment was late or absent for pickups; (4) defendant paid for a cruise for herself and her family; and (5) defendant bought a car and new house. Defendant argues this evidence was clearly irrelevant, highly prejudicial and only introduced to taint the jury's view of Shorter. As defendant failed to object to any of this evidence, we review for plain error and see none. *See United States v. Haldar*, 751 F.3d 450, 456 (7th Cir. 2014) (citing *United States v. Alexander*, 741 F.3d 866, 870 & n.1 (7th Cir. 2014) (the defendant having failed to object at trial, we review for "plain error," meaning an error "so obvious and prejudicial that the district judge should have intervened without being prompted.").

Certainly this evidence presents the possibility of prejudice, but each was relevant to the government's rebuttal of Shorter's defense that she created Empowerment for altruistic reasons and billed incorrectly due to mere negligence. Accordingly, we see no error in the district judge's failure to *sua sponte* exclude these questions. *See United States v. Whiting*, 471 F.3d 792, 801 (7th Cir. 2006) (no abuse of discretion in admitting evidence of defendant's "management fees, expense reimbursements, and personal expenditures" to prove specific intent to defraud).

Defendant's challenges to Counts 2, 3, and 4 of the indict-ment face a similar uphill battle, having failed to raise any ob-jection before the district court as to a defect in the indictment as required. *See* FED. R. CRIM. P. 12(b)(3) (if "reasonably avail-able" and resolvable without a trial on the merits, a defendant must challenge a defect in an indictment by motion); FED. R. CRIM. P. 12(c)(3) (if a defendant fails to file such a pretrial mo-tion, he or she must show "good cause" for raising this argu-ment for the first time on appeal). Since defendant makes no claim that her challenges on appeal were unavailable in the district court, nor that she had good cause for not raising them until on appeal, her challenge to the indictment fails on that ground alone. *See United States v. Acox*, 595 F.3d 729, 730-32 (7th Cir. 2010) (failure to meet good cause standard is a suffi-cient ground to reject new argument on appeal); *United States v. Johnson*, 415 F.3d 728, 730-31 (7th Cir. 2005) (same).

Even if the good cause standard were satisfied, however, the defendant has not demonstrated that Counts 2 through 4 as charged in the indictment were so "obviously defective as not to charge the offense by any reasonable construction." *United States v. Cox*, 536 F.3d 723, 726 (7th Cir. 2008) (quoting *United States v. Sandoval*, 347 F.3d 627, 633 (7th Cir. 2003)). Spe-cifically, defendant argues for the first time on appeal that: (1) Counts 2-4 failed to include "essential facts constituting the offense charged" as required by Federal Rule of Criminal Pro-cedure 7(c); and (2) the indictment provided her with inade-quate notice and subjected her to duplicitous counts of con-viction. As explained more fully below, the record contradicts both assertions. Moreover, the defendant has not shown that the phrasing of the indictment actually prejudiced the out-come of the trial. *See United States v. Vaughn*, 722 F.3d 918, 925

(7th Cir. 2013) (indictment is subject to dismissal if the requirements of Rule 7(c) are not satisfied *and* the defendant suffered prejudice).

As for notice, the defendant would now take issue with the government's repeated use of "C.C." to identify two, different individuals in Counts 2, 3, and 4, both of whose identities Shorter is charged with taking to commit Medicaid fraud. Defendant further argues that the government exacerbated this error by failing to separately identify the two individuals identified as C.C. by name in its opening statement. Finally, defendant notes that summary Trial Exhibits 35 and 40, which *did* contain the individuals' actual names, were never mentioned during trial, meaning the indictment fails because defendant will be unable to plead double jeopardy in future prosecutions regarding her company's use of either C.C. during this same period of time.

As an initial matter, the indictment's failure to include Cook's and Cox's names does not by itself warrant reversal, even if the objection had been timely made. To the contrary, the record shows that the defendant here knew the identities of both C.C.s by the time of trial. Regardless, defendant made no effort to show that she would have received a more favorable outcome as to any of the three counts at issue had the charges been more explicit in this regard. *United States v. Smith*, 230 F.3d 300, 306 (7th Cir. 2000) (failure to identify a person in the indictment is insufficient to warrant reversal "especially when no prejudice is alleged").

With regard to the indictment not specifically identifying Cook and Cox by name, defendant and her counsel *knew* the actual identity of each C.C. by trial, at the latest. To the extent there was any remaining confusion as to which C.C. was

which, the trial evidence certainly cleared that up. In particular, the testimony and exhibits relating to Empowerment's billings show that Cook corresponds with the C.C. in Count 2 (involving only August 2012 billings), as Empowerment submitted no bills for Cook in June or August of 2013. Likewise, Empowerment's billings for Cox correspond to the C.C. in Counts 3 and 4 (involving June and August 2013 billings), since Empowerment did not even begin billing using Cox's information until June of 2013. Indeed, at the close of the government's evidence, defendant's counsel acknowledged Cook and Cox were the people described in the indictment *and* that there was evidence of unauthorized use of their identities.[3]

Even assuming defendant and her counsel were somehow unaware of the identities of each C.C., she cannot show prejudice because her defense at trial was not specific to separate or distinct billings; instead, defendant claimed that she was not responsible for *any* of the billings errors because she had no intent to defraud. Given this, it is unclear at best, how things would have been different had the indictment explicitly charged a specific, single misuse of the C.C. identity in each count charged. Regardless, we see no potential for prejudice.

---

[3] For this reason, appellant's citation to *United States v. Stringer*, 730 F.3d 120 (2d Cir. 2013), only hurts her argument here. In *Stringer*, the court rejected the defendant's complaint that the indictment should be dismissed because it did not identify the name of the persons whose identities had been misused, in part because the defendant had actually known the victim's names before trial. *Id.* at 124. The same is true here: the trial record shows that Shorter knew that Cook and Cox were the C.C.'s referred to in Counts 2-4 both before and certainly during the trial itself.

As for defendant's challenge to Counts 2-4 being duplicitous, our review is under a plain error standard. An indictment is deemed "duplicitous" when it "charges two or more distinct offenses within a single count." *United States v. Hassebrock*, 663 F.3d 906, 916 (7th Cir. 2011); *United States v. Davis*, 471 F.3d 783, 790 (7th Cir. 2006). In Counts 2-4, the defendant here is charged with "knowingly transfer[ing], possess[ing], or us[ing], without lawful authority, a means of identification of another person" in furtherance of health care fraud in violation of 18 U.S.C. § 1028A. Given the evidence at trial showed that Empowerment submitted multiple billings using Cox's and Cook's identities during the relevant time period for each Count, defendant argues those counts are duplicitous. The defendant points in particular to Trial Exhibits 35 and 40, which contain multiple examples of fraudulent billings for each of the time frames described in Counts 2-4.

The defendant raises an interesting question of law, although it is not yet one addressed by this court. *See, e.g., United States v. Resnick*, 823 F.3d 888, 897 (7th Cir. 2016) (citing *United States v. Olano*, 507 U.S. 725, 732 (1993), for the proposition that an error is not plain "unless [it] is clear under current law"). In particular, this court has not squarely decided whether each charge brought under § 1028A may be satisfied by more than one misuse of another's identity. The defendant cites *United States v. Soto*, 799 F.3d 68, 87-88 (1st Cir. 2015), in which the court held that "each use constitutes its own violation of § 1028A," but that decision does not plainly answer the question before this court. Indeed, in *Soto*, the First Circuit cited to a decision from this court, *United States v. Cejas*, 761 F.3d 717, 731 (7th Cir. 2014), in support of its holding, but *Cejas* actually rejected a double jeopardy challenge to two violations of 18 U.S.C. § 924(c), after finding the two violations involved "two

drug offenses based on separate and distinct conduct." 761
F.3d at 731. While the *Cejas* and *Soto* decisions may provide
support for defendant's position, they certainly do not ex-
pressly address the proper unit of prosecution for § 1028A in
this circuit. Given that this issue is before us on plain error
review, therefore, any arguable error is certainly not plain.

Even assuming plain error, defendant has not shown ac-
tual prejudice. Duplicitous charges may prejudice a defend-
ant in four ways: "the defendant may not understand the
charges against [her], might be convicted by less than a unan-
imous jury, may be prejudiced by evidentiary rulings at trial,
or may be subjected to double jeopardy." *Davis*, 471 F.3d at
790. Defendant argues that she has been prejudiced in three
of those four ways, but none of those ways has any traction
on this record. First, defendant argues that the indictment did
not properly inform her of the nature of the charges, because
it grouped together the Cook and Cox billings from August
2012, June 2013 and August 2013. However, the prejudice in-
quiry concerns whether the defendant was able to prepare a
defense at trial. *See United States v. Kimberlin*, 781 F.2d 1247,
1250 (7th Cir. 1985). As explained above, the trial record does
not suggest that appellant was confused about the charges. As
mentioned already, defendant's theory at trial was not to dis-
pute the inaccuracy of *any* individual billings. Instead, de-
fendant generally challenged her culpability for any and all
errors based on her lack of intent. Perhaps most significantly,
defendant makes no showing that her defense would have
changed if the indictment were more precise or limiting in its
description of the specific false billings at issue with respect
to Counts 2-4.

Second, the defendant argues even less persuasively that
the indictment's broad language might prevent her from as-
serting a double jeopardy argument with respect to these
counts in the future. As the government points out, broadly-
worded indictments charging the defendant with fraudulent
billings during a specified time period *would* bar later prose-
cution for *any* billings during those time periods. *See United
States v. Folks*, 236 F.3d 384, 392 (7th Cir. 2001) (precluding the
possibility of a second prosecution for conduct encompassed
by a broadly-worded indictment). Defendant argues alterna-
tively that she may not assert double jeopardy in the future
because there is no pleading that actually identifies which
C.C. is involved for each count, and another court will not be
equipped to determine who each of the victims actually were.
To give that position any credence, however, the court would
have to ignore the trial record identifying each C.C. by name,
since defendant would be able to cite to that record in the
highly unlikely event that another jurisdiction would attempt
to prosecute her for the Cook August 2012 billings or the Cox
June and August 2013 billings.

Third, appellant contends that duplicitous counts created
the possibility of non-unanimous verdicts as to Counts 2-4,
because the jury was not instructed that they had to all agree
on a "particular billing." While an instruction on unanimity
may have been preferable in this context, defendant was the
one in the best position to both see and raise that issue. Obvi-
ously, the defendant did not perceive any problem with this,
nor do we. Even if defendant *could* articulate some specific an-
imus or material problem of differentiation, she again failed
to object, and we can see no plain error here. *See United Sates
v. Mannava*, 565 F.3d 412, 415 (7th Cir. 2009) ("An error is plain

if it is clearly an error and could with some nontrivial proba-bility have changed the outcome of the case."); *see also United States v. Pavloski*, 574 F.2d 933, 936 (7th Cir. 1978) ("no possi-bility of prejudice through lack of unanimity" because the de-fendant did not dispute that he did the acts).

Finally, the defendant challenges the sufficiency of the ev-idence as to Counts 2-4. To clear this "nearly insurmountable hurdle" in reversing a conviction, defendant has to show that there was "no evidence, no matter how it is weighed, from which a rational jury could find guilt beyond a reasonable doubt." *United States v. Bek*, 493 F.3d 790, 798 (7th Cir. 2007). As the government submitted a substantial amount of evi-dence to support the convictions for Counts 2-4, defendant's challenge also fails to clear that formidable hurdle.

This then leaves defendant's challenge to the admissibility of Trial Exhibits 35 and 40. As an initial matter, the admission of these exhibits was never an issue at trial. While defendant would now argue that Federal Rule of Evidence 1006 requires a witness to testify that the content of summaries are accurate to admit them at trial, citing to *United States v. Green*, 428 F.3d 1131, 1134 (8th Cir. 2005), defendant expressly stated that she had *no* objection to any of the trial exhibits, so she has waived her right to do so on appeal. *United States v. Murry*, 395 F.3d 712, 717-19 (7th Cir. 2005). In fact, the government elicited tes-timony that Exhibit 35 was a summary of Empowerment's billing for Cox, and the government referred to Exhibit 40 during closing without objection.

Regardless, the *Green* opinion is mistaken in reciting the requirements for admission of a 1006 summary. In particular, there is no explicit requirement that a witness testify about its accuracy at trial. To the extent the Eighth Circuit suggested

otherwise in *Green*, it misapplied its earlier decision in *United States v. King*, 616 F.2d 1034 (8th Cir. 1980), which was a case involving the admissibility of pedagogical charts prepared by a government witness to summarize her knowledge of the organization of housing projects. *Id*. at 1041. In that case, the presence of a witness was crucial. However, a proponent of a summary exhibit need only make a showing "that the underlying records are accurate and would be admissible as evidence." *United States v. Oros*, 578 F.3d 703, 708 (7th Cir. 2009). If defendant had objected to the admissibility of Exhibits 35 and 40, a witness may have been the government's avenue to lay such a foundation, but since the defendant never objected, we are left to guess whether the 1006 summaries were accurate compilations of admissible evidence. Since they appear to be, we certainly have no basis to second-guess the district court's exercise of sound discretion in admitting them. At minimum, the defendant has once again failed to establish clear error in the summaries' admission.

Moreover, Trial Exhibits 35 and 40 support defendant's convictions for Counts 2-4, along with other substantial, independent evidence admitted at trial. For instance, Cook and Cox both testified that they did not ride in a wheelchair during the relevant time periods, while Exhibits 35 and 40 show that Empowerment billed for Cook and Cox's supposed need for wheelchair assistance during the relevant time period. Further, Empowerment's 2012 billings for Cook showed that she was both the first *and* second passenger, supporting the jury's finding as to Count 2. Finally, even though Cox testified that she did not have an attendant during her 2013 rides, the evidence shows Empowerment billed for an attendant during the relevant time periods for Counts 3 and 4.

Significantly, defendant fails to address Exhibit 18, Empowerment's actual trip tickets for Cook and Cox during the relevant time periods, which independently support the conclusion that she used their identities to carry out Medicaid fraud. Nor does defendant attempt to explain away the testimony of Cook or Cox. Instead, defendant would have us focus on the fact that there was no *direct* evidence that she *personally* submitted the billings for reimbursement. In particular, defendant points to testimony of witnesses that she only sometimes did the billings, and Annette submitted the billings during the relevant time periods as to Counts 2-4.

However, this argument ignores the other, powerful *circumstantial* evidence that permitted the jury to convict her, especially because the jury could reasonably *infer* from the evidence that she "caused" the fraudulent billings. *United States v. Thomas*, 763 F.3d 689, 693 (7th Cir. 2014) ("[D]irect evidence is not required to find an element of a crime beyond a reasonable doubt")**.** In fact, the testimony of the trial witnesses amply supports the conclusion that Shorter either personally submitted fraudulent billing using Cook's and Cox's identities herself *or* that Annette or Lakesha submitted those billings at the defendant's direction. First, there is Shorter's statements to an FBI agent that she was both comfortable with and actively involved in the billing process. Second, the evidence showed that Shorter was actively involved in both training Annette and Laskesha and managing how they prepared the bills. Third, Annette and Lakesha both testified generally that they did the billing for Empowerment consistent with the training that the defendant provided, and they each testified specifically to coding Empowerment's Medicaid billings using only the four codes that Shorter instructed them

to use without knowing if they applied. To the extent the evidence showed that Shorter did not *personally* prepare the relevant fraudulent billings, therefore, the jury had ample grounds to reasonably conclude that those fraudulent bills were submitted at her direction.

Accordingly, we AFFIRM.